172 P.3d 295 (2007)
216 Or. App. 268
In the Matter of A.M.C., a Minor Child.
STATE ex rel. DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
J.A.C., Appellant.
JV9948; Petition Number 090806ACM; A135346.
Court of Appeals of Oregon.
Argued and Submitted August 22, 2007.
Decided November 28, 2007.
*296 Megan L. Jacquot argued the cause and filed the brief for appellant.
Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN and ORTEGA, Judges.
SCHUMAN, J.
Mother appeals from a judgment terminating her parental rights regarding her daughter. The trial court found mother unfit *297 on several grounds; we focus on mother's mental deficiency, her unwillingness or inability to keep child away from an unfit parent, and her failure to effect a lasting adjustment after reasonable efforts by the Department of Human Services (DHS). On de novo review, ORS 419A.200(6)(b), and giving considerable weight to the trial court's demeanor-based credibility findings, State ex rel Juv. Dept. v. Geist, 310 Or. 176, 194, 796 P.2d 1193 (1990), we affirm.

I. HISTORY
A. Events leading to child's removal from home
Child was born on August 28, 2005. In the months before child's birth, mother voluntarily participated in prenatal education services offered by the Coos County Health Department and worked with Katherine Cooley, a public health nurse, as part of a program designed to ensure a healthy pregnancy outcome. During an initial assessment, Cooley identified mother as a "high-risk" client, in part because of mother's history of depression and multiple suicide attempts. Cooley was also concerned about mother's level of intellectual functioning; in particular, she worried that mother was not absorbing her instructions and would not follow them.
On June 13, 2005, Cooley visited mother and father's[1] apartment and observed what she believed to be signs of possible domestic unrest, including, potentially, violence: father's hostile, aggressive, and controlling behavior; mother's apparent need to ask father for permission to leave the apartment; and mother's statement that she feared that father would leave if she again allowed a stranger into the house without his permission. Cooley testified that this was the first time in her six years as a public health nurse that she had ever felt in danger. She attempted to arrange mental health treatment for mother, but mother declined.
On August 29, one day after child's birth, the hospital notified DHS of concerns about mother's mental health, possible substance abuse while pregnant, and prior hospitalization for suicidal thoughts. DHS sent caseworkers to the hospital to investigate. Although child was not taken into protective custody at that time, one of the caseworkers arranged a home visit with mother and child. After two unsuccessful attempts to conduct the visit, two caseworkers, accompanied by a police officer, called on mother and father at their apartment on September 15, and mother let them inside. They found the apartment cluttered with piles of clothing, trash, unmarked prescription bottles, and "excessive amounts of beer bottles."
Father was not at home when mother admitted the visitors, but he returned to the apartment during the visit. He appeared excited and jumpy, exhibited dilated pupils, spoke rapidly, and sweated profusely. The police officer, based on his background and training in drug recognition, suspected that father was under the influence of drugs and asked him to provide a urine sample. Father refused. The caseworkers, unable to determine at that point if it was safe for child to remain in the home with father, informed mother that child could stay with her if father left. Father agreed, but mother protested, stating that
"she used [father] as her back up, essentially, so that she could get away so she wouldn't hurt the baby * * * [a]nd * * * that she needed [father] there to take care of her, and to hold her, because the baby couldn't hold her. And she stated that she had a better one-on-one connection with [father] than she did with the baby because she's known him longer."
Child was taken into protective custody at that time because of concerns about mother's ability to care for child and meet child's basic needs, her relationship with father, who exhibited aggressive behavior, father's suspected alcohol and drug use, and the condition of the home. *298
B. DHS involvement in case
The next day, September 16, Anna Weidemiller, mother's primary caseworker, met with mother, father, and child to discuss the case and develop a plan to return child to mother's care. Father was so disruptive that Weidemiller asked him to leave the meeting. Thereafter, mother frequently left the meeting to consult with father about what to say or do. Mother was again presented with the choice of remaining with father or having the child returned immediately to her care, provided that she and child go to a women's shelter. Mother again chose father, stating "that [father] needed her. [Father] needed her right now to be with him and support him. And that her baby was safe with the foster parent." Mother added that "the baby was sleeping a lot right now, so that she wouldn't really have a lot of things to do with the baby, and it could get boring." Father again refused a urinalysis, and child remained in protective custody.
On December 1, the court took jurisdiction over the child as to mother. On December 9, mother signed a DHS service agreement requiring her to continue attending regularly scheduled visits with child, to participate in a psychological evaluation, to take part in a DHS-approved parenting program, and to keep DHS informed of her contact information and address.
DHS transferred mother's case to its Permanency Unit on January 24, 2006, indicating that the agency believed that it might not be able to return child to mother. Caseworker Ashley Howell replaced Weidemiller at that time, though Weidemiller remained involved until March of that year. During a car ride with Weidemiller on March 6, mother commented that child was a "spoiled brat." Additionally, on April 11, mother told Howell that child "really hates being jerked from foster home to foster home, having foster parents tell her that they can't keep her and they don't like her." In fact, child had lived in one foster home since she was taken into custody.
Howell delivered a new letter of expectation to mother on April 16 that required her to attend counseling at the Coos Bay Coastal Center, complete the INOKA ("It's Not Okay Anymore") domestic violence program at the Coos Bay Women's Safety and Resource Center, and continue visiting with child at DHS. A third version of this letter was drafted on May 19, after the court established jurisdiction over child as to father, adding the requirement that mother discontinue all association with him.
C. Psychological evaluation of mother
Mother participated in a psychological evaluation on December 21, 2005, with Dr. Jerome Gordon. Gordon found mother to be functioning at a borderline intellectual level, slightly above the level of mild retardation  in his opinion, a permanent and untreatable condition. He also testified that mother's low level of intellectual functioning would likely impair her ability to safely parent a child on a sustained basis and render day-to-day functioning as a parent difficult. He was unable to fully confirm a personality disorder because of mother's lack of cooperation throughout the evaluation, but he testified to his belief that some disorder was present. He also expressed concern about mother's tendency to ascribe her own thoughts and ideas to child. He worried that "she would have difficulty responding to the actual needs of the child because she's more responding to her own."
D. Mother's participation and performance in services
Mother attended 10 of 14 one-on-one sessions with parent-mentor Laurie Eck from January 10 to April 25, 2006. Eck, however, worried that mother was not retaining information. For example, although mother and Eck had discussed the fact that child was no longer using a pacifier at the time of their first meeting, mother continued to bring a pacifier to subsequent sessions, contrary to Eck's instruction. During one session, mother reintroduced it several times after child spit it out. Eck was also concerned during a session on March 14, when mother brought in a newborn-size diaper, which was obviously too small, and a pair of jeans sized for an 18-month-old, which were obviously too big; child was seven and one-half months old at the time. Mother also talked about wanting *299 to feed child a "Happy Meal" on March 28, when child was not yet able to eat solid foods.
Mother sporadically attended the counseling sessions offered to her through the Coastal Center and then stopped attending entirely. She failed to come to her first appointment on January 27, 2006. After missing another appointment, she attended a rescheduled session on February 9, and the Center conducted an intake assessment. Mother never returned after that date, and the Center prepared a discharge summary on March 22. On March 23, however, mother returned and participated in a second assessment. She attended five of ten subsequent scheduled sessions, the last on August 1. On September 11, the Center conducted a second discharge summary after mother failed to attend two scheduled appointments and her counselor learned that she had moved to Salem. The Center conducted a third and final assessment on November 6. Mother attended two appointments, one on November 27 and another on December 4. The Center has not seen her since that time.
Mother also stopped participating in the Center's group parenting classes, to which she was referred when a mentor was no longer available for one-on-one help, after attending only three classes in the 22-course program beginning in November 2006. After she cancelled one appointment on December 6 and then failed to attend four more, the program officials closed her file.
Mother attended six of the 12 INOKA classes required from May until July 28, 2006. She did not complete the program.
E. Mother's visits with child at DHS office
Mother participated in visits with child at the DHS office beginning in September 2005. DHS workers who observed these visits testified that mother often failed to retain the information provided and that she required repeated reminders about how to perform basic parenting skills. They also observed the following interactions.
Mother continually overfed child in defiance of repeated DHS instruction, often until child would vomit. During one confrontation with DHS concerning that issue, mother insisted that child was "starving" and "crying out for food." Mother often arrived for visits in her pajamas and fell asleep, once while she was holding child. She tried to pick child's nose with child's finger. She bent child's fingernails back instead of using clippers. She picked at child's scalp, skin, and nose. She harshly cleaned child's face, and when child expressed discomfort, saying "ow-ee," mother replied, "[y]ou don't have ow-ees."
Further, mother would often attribute child's behavior to child disliking her. During one visit when child was playing and kicking her legs in the air, mother accused child of kicking her, as child did when mother was pregnant, because child did not like her. On another occasion, child wanted to walk around the room when mother was suffering from a minor injury, and mother accused child of not caring that such a walk would hurt her. She also talked to child as if she would answer back when child could not yet speak.
On several occasions, mother yelled in child's face when child cried, once lowering herself to the floor on her hands and knees to get closer to child's face. When confronted about this behavior by a DHS worker, mother stated that child liked it, explaining "[t]his is how we talk." Mother would also mock child by pretending to cry back in child's face. She accused child of "fake crying" and called her a "big baby," "piggy," and a "big poop." She told child that she did not have "real tears." Mother stopped visiting child in August 2006, when she went to Salem after her brother died. She did not provide DHS with any contact information and remained out of touch with the agency for two months. Visitation resumed in October 2006, when mother "realized" that she missed child.
F. Mother's current living situation
At the time of the trial, mother was living with father in his mother's home. Father's parental rights were terminated by the trial court on the basis of (among other things) his diagnosed antisocial personality disorder, continued use of illegal controlled substances, and resistance to all DHS services. Father *300 did not appeal that judgment. Mother testified that, if child is returned to her care, she intends to stay with father and seek additional public assistance so that they can move into a unit of their own.

II. DISCUSSION
The trial occurred in February 2007, approximately 18 months after child was removed from mother's care at the age of two and one-half weeks. The trial court found that the state had established, by clear and convincing evidence, that mother and father are unfit. The court found the testimony of nurse Cooley, the police officer, and the DHS witnesses credible. The court found mother's and father's testimony not credible.
On appeal, mother argues that the state failed to establish that mother would be unable to integrate child into her home within a reasonable time. She contends that termination is not in the best interest of child when the "parents are still making progress toward reunification and the child is suffering no ill effects from care." The state responds that mother is unable or unwilling to provide a stable, permanent home for child; that additional time for services will yield little or no result; and that mother's unhealthy dependence on father, whose rights have been finally and conclusively terminated, is extremely problematic.
The trial court terminated mother's parental rights under ORS 419B.504. That statute
"sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Second  and only if the parent has met the foregoing criteria  the court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'"
State ex rel SOSCF v. Stillman, 333 Or. 135, 145, 36 P.3d 490 (2001) (quoting ORS 419B.504, in part). Additionally, expanding on the concept of "seriously detrimental," the Supreme Court has noted that
"the focus of * * * the test for termination * * * is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."
Id. at 146, 36 P.3d 490. Finally, the court must decide whether the termination of parental rights is in the best interest of the child, ORS 419B.500, measured at the time of trial, State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 96, 149 P.3d 1124 (2006). The state must prove unfitness by clear and convincing evidence. ORS 419B.521(1). All proven conduct or conditions will be viewed in combination in determining whether a parent is unfit. See, e.g., State ex rel Dept. of Human Services v. Radiske, 208 Or.App. 25, 49, 144 P.3d 943 (2006); State ex rel Dept. of Human Services v. Rodgers, 204 Or.App. 198, 217-18, 129 P.3d 243 (2006); State ex rel SOSCF v. Mellor, 181 Or.App. 468, 476, 47 P.3d 19 (2002), rev den, 335 Or. 217, 65 P.3d 1108 (2003).
ORS 419B.504 provides a nonexclusive list of factors that the court must consider in determining whether a parent is unfit and whether the circumstances making the parent unfit are unlikely to change. The statutory factors relevant to this case are as follows:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"* * * * *

*301 "(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
ORS 419B.504.
Guided by these precepts, we agree with the trial court's thorough and thoughtful opinion concluding that mother has a mental deficiency that renders her incapable of learning the necessary parenting skills to provide safe and proper care for child for extended periods of time; that she has failed to adjust her circumstances or conditions to make child's return possible by keeping child away from father, an unfit parent; and that she has failed to effect a lasting adjustment after efforts by available social agencies for such time that it appears no lasting adjustment can be effected. We further agree that such conduct was seriously detrimental to child; that clear and convincing evidence supports the finding that mother will, in all probability, fail to change her conduct within a reasonable time; and that termination of mother's parental rights is in child's best interest.
A. Conduct or condition seriously detrimental to child
1. Mental deficiency
We agree with mother that borderline intellectual functioning does not, by itself, foreclose the possibility of fit parenting. See State ex rel Dept. of Human Services v. Smith, 338 Or. 58, 85, 106 P.3d 627 (2005) (reversing trial court's finding of unfitness where there was no evidence of serious detriment to child as a result of mother's low IQ). However, the record in this case shows that mother's borderline intellectual functioning prevents her from absorbing and retaining necessary parenting information. Cooley and Eck, who both worked closely with mother and child, testified that mother's inability to retain information caused them considerable concern. Incidents such as that with the pacifier and the continual overfeeding of child as an infant demonstrate that mother is incapable of learning basic parenting skills, even after pointed and repeated instruction. Mother's statements when confronted about her behavior demonstrate not only an inability to learn, but also an obstinacy to corrective efforts. Further, the DHS workers who monitored mother's visits with child testified that mother would often project adult emotions and characteristics onto child, attributing child's behavior to child disliking her. This inability to recognize child's needs prevents mother from responding to those needs appropriately, rendering her incapable of providing proper care.
Mother correctly points out that the state must also prove that her condition is seriously detrimental to child. "That requirement does not specify that the serious detriment must already have occurred as a prerequisite to termination. A condition or conduct can be called `detrimental' based on potential harm even before that harm comes to pass." State ex rel DHS v. Payne, 192 Or.App. 470, 483, 86 P.3d 87 (2004). Gordon testified that mother's intellectual functioning is so low that her ability to safely parent a child on a sustained basis would be impaired. Mother has repeatedly demonstrated that impairment in her interactions with child. Furthermore, her condition is permanent and untreatable. The state has thus met its burden in showing that mother's mental deficiency is seriously detrimental to child.
2. Failure to adjust circumstances
Mother not only has failed to adjust her circumstances and conditions to make child's return possible; she has refused to do so by virtue of her complete dependence and unwavering allegiance to father, an unfit parent. In refusing to disassociate herself from father, she has failed to make an adjustment necessary to allow for child's return. She has maintained and demonstrated consistently that she is either unable or unwilling to keep child away from father, even when that decision means that child will be taken from her care. In choosing father over child in both the past and present, mother is acting *302 in a way that is seriously detrimental to child.
3. Failure to effect a lasting adjustment
Mother has failed to effect a lasting adjustment by participating in the services offered to her. She declined to attend the mental health appointments that nurse Cooley offered to arrange for her; she sporadically attended and then quit attending Coastal Center counseling sessions; she failed to complete the INOKA domestic violence program; and she attended only three of 22 Coastal Center parenting classes. Mother's visits with child at the DHS office were similarly unpredictable, as she frequently overslept or simply failed to attend scheduled visits. She also stopped visiting child altogether during a two-month period when she moved to Salem and failed to provide DHS with any contact information. She participated in only 10 of 14 mentoring sessions.
Mother argues that the state's assessment of her participation in services is premature and that DHS's efforts were unreasonable because the agency stopped providing mentoring when the mentor became unavailable. We disagree. Mother had nearly 18 months to engage in the services offered to her and failed to do so. There is little evidence that mentoring sessions were effective and no evidence that mother would have been unable to benefit from group sessions had she chosen to attend them.
In sum, DHS's efforts were more than reasonable. Mother's failure to participate in services is seriously detrimental to child because child needs a parent who will recognize and respond to her needs appropriately. Mother is either unable or unwilling to effect a lasting adjustment by using DHS resources to learn the parenting skills necessary to provide child with proper care.
B. Integration into mother's home
Even after finding that mother's condition and conduct at the time of trial are seriously detrimental to child, we must also find that integration of child into mother's home is "improbable within a reasonable time due to conduct or conditions not likely to change" in order to affirm the trial court's termination judgment. ORS 419B.504. Mother has had nearly 18 months to adjust her conduct. Given her permanent condition, refusal to engage in services, and inability or unwillingness to disassociate herself from father, we find, by clear and convincing evidence, that child cannot safely be returned to mother within a reasonable time.
C. Best interest of the child
In light of the findings above, we conclude that child's best interest will be served if she is freed for adoption.

III. CONCLUSION
Mother's mental condition, inability or unwillingness to adjust her circumstances, and failure to effect a lasting adjustment after reasonable efforts by DHS have had a seriously detrimental effect on child. That condition and conduct persist and are unlikely to change within a reasonable time so as to allow child safely to integrate into mother's home. It is in child's best interest to be freed for adoption. We therefore affirm the trial court's judgment terminating mother's parental rights.
Affirmed.
NOTES
[1] Mother and father initially denied father's paternity. However, they later signed a joint paternity affidavit in late May 2006, establishing father's paternity. The court took jurisdiction over child with respect to father on June 1, 2006. As discussed below, the court terminated father's parental rights and he does not appeal from that judgment.