200 P.3d 567 (2009)
225 Or. App. 115
In the Matter of K.A.S., K.P.S., and J.C.S., III, Minor Children.
State ex rel. Department of Human Services, Respondent,
v.
J.S. and B.A.S., fka B.S., Appellants.
0600167M, 0600168M; A136298.
Court of Appeals of Oregon.
Argued and submitted on July 9, 2008.
Decided January 7, 2009.
*569 James J. Spindor, Klamath Falls, argued the cause and filed the brief for appellant J.S.
Daniel J. Casey argued the cause for appellant B.A.S. On the opening brief was James A. Palmer. On the supplemental brief was Daniel J. Casey.
Stacey RJ Guise, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
LANDAU, P.J.
Mother and father appeal a judgment terminating their parental rights to their three children on unfitness and neglect grounds. The trial court ordered the termination as to mother based on her conduct and conditions that are detrimental to the children, including her mental illness, unstable living conditions, and her failure to acquire adequate parenting skills. The court ordered the termination as to father because of his habitual alcohol use, domestic violence, and criminal conduct, as well as his failure to acquire adequate parenting skills.
*570 On appeal, both parents challenge the sufficiency of the evidence to support the terminations. Father also advances other assignments of error. He contends that the court abused its discretion in denying his motion to set aside the termination judgment with respect to his parental rights on the basis of his pending criminal appeal. He also argues that the court erred in proceeding to a termination trial without first holding a permanency hearing. Before this court, he asserts that his trial counsel was inadequate for failing to object to the failure to hold a permanency hearing. We reject all the claims of error and affirm.

I. FACTUAL BACKGROUND

A. Mother's prior DHS case

Mother and father began living together in 1998. At that time, mother had two children, and the Department of Human Services (DHS) had already become involved regarding those children. Father had three children of his own whom he was prohibited from contacting by court order. Mother had been diagnosed with schizoaffective bipolar disorder. Her condition is characterized by delusions, hallucinations, and intensely varying moods, ranging from severe depression to mania and elation. She responds well to medication, although environmental stressors still trigger decompensation. For mother, decompensation results in more active delusions and hallucinations, belief that people are trying to harm her, and deterioration in her ability to care for herself. In particular, during decompensation, she suffers from severe weight loss, sometimes to a life-threatening extent. Over a long period of time, mother has struggled with periods of medication noncompliance and decompensation, resulting in numerous hospitalizations and civil commitments. She also has a history of abusive intimate relationships.
Father voluntarily participated in mother's DHS case, but did not complete the services. In 1999 and 2000, respectively, father and mother filed restraining orders against each other, alleging physical abuse. After a hospitalization due to a decompensation in early 2001, mother began to recognize the importance of medication compliance for her to live a "normal" life. Later that year mother stipulated to the termination of her parental rights to both of her children. Those children are not at issue in this case.

B. Father's criminal history and substance abuse

By the time mother and father began their relationship, father had an extensive criminal history, including, among others, convictions for theft, several assaults, and several incidents of driving while his drivers' license was suspended. He had been incarcerated or under supervision for all of his adult life.
Father began abusing alcohol as a teenager, and, as a young adult, he also frequently used methamphetamine. He started drug and alcohol treatment in 1999, but was discharged from the program due to noncompliance. In 2000, he was still using methamphetamine and alcohol and was charged in Oregon with driving under the influence of intoxicants (DUII). Several months later, father was convicted in California of making terrorist threats and served two years in prison. After his release, he was convicted in Oregon on the DUII charge and also for witness tampering in connection with that charge. Father was sentenced to probation, a condition of which was father's completion of an alcohol treatment program. After some initial noncompliance, father completed an alcohol treatment program in November 2002.

C. Mother and father's voluntary DHS case

The parties' first childa daughterwas born in April 2003. Soon after, DHS received a referral relating to a decline in mother's mental health and the effect it might be having on the infant. That referral proved unfounded, but the parents agreed to engage in voluntary services. A component of father's service agreement was that he would notify DHS if mother displayed any "concerning symptoms" of her mental illness. Pursuant to their service agreements, the parents enrolled in parenting classes, although only mother successfully completed those classes.
*571 In June 2003, mother called 9-1-1 to report that father had attempted suicide. She told the responding police officers that father had come home intoxicated and that they had argued. She said that father had broken two items in the home and had slapped her while she was holding the infant; the officers saw a nickel-sized mark on mother's cheek. Mother recalled that father had struck her once before but stated that she had not reported the incident. When questioned by the officers, father denied that he had attempted suicide; he also denied that any violence had occurred between the parents. The officers smelled alcohol on father's breath and, because father was prohibited from consuming alcohol as a condition of his probation, they arrested father.
Shortly after, mother saw her longtime county mental health department caseworker, Tingley, who noticed bruising on mother's cheek. Mother recounted the details of the incident, but seemed stable. Mother met with DHS caseworker Fenner the next week. Mother told Fenner the same story she had told the police officers and Tingley, except mother denied any prior domestic violence. DHS instituted a new safety plan that prohibited father from having any contact with the infant until father remediated his domestic violence. Mother eventually recanted her allegations, and the state pursued no criminal charges against father for the incident. The parents' voluntary DHS case was closed in November 2003 at the request of mother.

D. Mother and father's current DHS case

Mother met regularly with county mental health department staff, who noticed that her mental health began to decline in July 2004. In September, mother stated that father was threatening her and that she wanted to leave him. A few months later, in December 2004, mother gave birth to another daughter. Later that month, mother said that father was threatening to take the children away from her. Father then obtained a restraining order against mother, reporting that she had begun decompensating after the birth of their second child and that mother's medication was no longer working. Father later said that he did so out of concern for the safety of the children. Because one of mother's brothers had told her that her medication would negatively impact her breastfeeding infant, she had actually stopped taking her medication.
In January 2005, DHS caseworker Riddle went to the parents' home in response to a call regarding mother's mental stability. The parties were cooperative and claimed that mother was taking her medication; they denied that anything was amiss. After speaking to someone at the county mental health department and observing that the two daughters appeared clean and healthy, Riddle left the children in the parents' care.
On February 10, 2005, mother went to a neighbor's house with the children and asked for a ride to the courthouse; she wanted to obtain a restraining order against father because he had beaten her. After requesting the restraining order (but before father was served), they returned to the parents' residence, where father was packing some items because he knew that mother had filed the request. He told the neighbor that mother's mental health was declining and that he was concerned about her safety and the safety of the children.
On February 12, 2005, Officer Sickler responded to a call from a motel to check on the welfare of the children. He found mother in the hall outside her room with the children and all of their belongings; she had been staying at the motel for a few nights but had turned her key in to the front desk. He asked her questions to ascertain whether the children were safe. At first she denied that she was going anywhere. She later admitted that she was leaving the state, but that she had not arranged transportation. Both of the children were dirty, and one of them had a urine-soaked diaper. Mother appeared dirty herself, had a dazed expression, would not make eye contact, and answered questions only in vague ways. Concerned for the safety of the children, Sickler called DHS.
Fenner, the DHS caseworker who had previously worked with the parents, arrived at the motel and talked to mother. Mother told Fenner that she had a restraining order against father. Fenner advised mother to *572 stay at the local crisis center with the children through the weekend so that mother could complete a mental health assessment on Monday. Otherwise, Fenner told mother, Fenner would take the children into protective custody. Mother refused to go to the crisis center, and Fenner removed the children from mother's care and placed them with a foster family.
DHS then filed a dependency petition asserting jurisdiction over the children with respect to both mother and father. Mother was again committed and hospitalized due to her deteriorated mental health. The court took jurisdiction over the children with respect to mother on April 6, 2005, by which time mother had been released from the hospital. She executed a service agreement that included regular supervised visitation with the children at the DHS visitation center, parenting classes, and nonoffender domestic violence classes.
The court did not take jurisdiction over the children with respect to father, but he voluntarily agreed to engage in services. Those services included a comprehensive psychological evaluation and parental assessment, parenting classes, regular supervised visitation with the children at the visitation center, regular contact with the DHS caseworker, compliance with the terms of his probation, and completion of a domestic violence assessment. Father was again designated as the safety plan for mother; he was to ensure that she took her medication and to report any signs of her declining mental health. The plan for the children at that time was family reunification.
To work toward that goal, the parents participated in the county's family court program, through which they would have greater access to services. For the next few months, the parents showed improvement. They received financial assistance to obtain and repair a mobile home. They were engaging in services and attending regular supervised visitation with the children. During the visits, however, father made mother do all of the parenting. Given the parents' apparent progress, the support team involved with family court continued to advocate for the family to be reunited. DHS remained concerned about returning the children to the parents' care.
On July 25, 2005, Dragovich, a clinical psychologist, conducted psychological evaluations of mother and father. According to Dragovich, mother's mental illness compromises her parenting abilities. She receives Social Security disability payments on the basis of her illness and her resulting inability to maintain employment. Mother's hospitalizations and decompensations, according to Dragovich, are dangerous to her and her children; she is unable to parent at all during a decompensation. Dragovich concluded that, as long as mother took her medication and utilized mental health support services, she could be "minimally effective[ ]" as a parent. In Dragovich's evaluation of father, which was based solely on self-reported information, she noted that she had no information about whether "he has behaved inappropriately with [the children]." At the time, however, Dragovich did not know the full extent of father's criminal history and current alcohol use because his self-report in those regards was not accurate.
The children were returned to the parents' care on July 29, 2005, but the family's situation soon began to deteriorate. The parents began missing their parenting and domestic violence classes. Father eventually completed the parenting classes, although mother did not. Father was working long hours. Mother was doing all of the parenting and household chores, and was looking "run down." She also had become pregnant. Mother refused an offer by DHS for a personal care attendant; she did, however, receive intensive home-based services for a short period of time, during which the service provider observed appropriate parenting by both parents. During a DHS visit to the home in October 2005, however, mother spoke in religiously fantastical terms about the older daughterthen two years old having "evil" in her and asserted that the daughter had a sexual relationship with father. Father was present at that conversation, but said nothing.
During that same period, father completed the community service requirements of his probation. Father's probation officer *573 did not terminate his probation, however; remaining on probation provided father with continued access to family court services that would otherwise be unavailable. Father was aware that he was still on probation and did not request that it be terminated.
On November 11, 2005, mother called 9-1-1 to report another act of domestic violence by father. Mother told the police officers who responded that father had been drinking, that she and father had argued, and that father had twisted her arm behind her back. She complained of pain in that arm, although neither officer observed any physical sign of violence. Father denied twisting mother's arm. He admitted that he had been drinking, but said that his probation did not prohibit him from consuming alcohol. The officers learned that consuming alcohol was in fact prohibited by the terms of father's probation. They arrested father for assault and violation of probation, and took him into custody.
Shortly after the incident, mother's mental health caseworker observed bruising on mother's arm and face. Mother was experiencing stress but was not decompensating. DHS followed up with mother regarding the referral for the domestic violence incident. Mother said that both children were present when father twisted her arm and that she had been holding their younger daughter at the time and had to drop her onto the couch. DHS again took the children into protective custody.
Dragovich updated her psychological evaluations of the parents after the incident. She made numerous recommendations: that mother move into the crisis center; that the children remain in foster care but have visits with mother; that father be fully evaluated for substance abuse problems; and that father not be able to contact the children until he is sober and participating in substance abuse treatment.
Mother moved into the crisis center, and entered into another service agreement with DHS. She agreed to continue her involvement with county mental health; regularly take her medication; participate in monthly blood draws to ensure medication compliance; attend regular supervised visits with the children; and maintain regular contact with DHS.
On November 30, 2005, the court took jurisdiction over the children with respect to father, and father entered into a new service agreement with DHS. The agreement required him to obtain assessments for domestic violence and drug and alcohol abuse; comply with the recommendations from those assessments; comply with the terms of his probation; and maintain regular contact with DHS. Father was also ordered not to have contact with mother without prior approval from the court. Shortly after that, father was released from police custody.
Father never participated in drug and alcohol treatment. He did complete a domestic violence assessment. Father was not accepted into the domestic violence program, however, because the full disclosure requirement for the program might undermine his case relating to the pending assault charge for domestic violence.
Mother gave birth to a son in January 2006. At the hospital following the birth, mother developed a kidney infection and began running a high fever. She insisted on caring for the newborn, although her care was inconsistent. During the night shift after the birth, she did not adequately tend to his needs (the child was observed with soiled clothing and bedding), although her care was attentive and appropriate the next day. That day, DHS removed the newborn from the mother's care, placed him in the same foster family that was caring for his siblings, and filed a dependency petition.
By early February 2006, DHS switched the plan for the children from reunification to adoption. The foster family that was caring for the three children was to be the children's adoptive placement. No permanency hearing was ever held in the case.
Meanwhile, mother was engaged in individual therapy, and her attendance at those sessions was good. She expressed ambivalence about her relationship with father. Mother admitted that father emotionally abused her, although she did not address physical abuse. Nevertheless, mother continued to profess her love for father and *574 expressed a desire to remain with him as a family.
Since the removal of the children in November 2005, mother regularly participated in supervised visits with the children. In March 2006, however, mother unexpectedly missed a visit. On mother's next scheduled visit, she arrived with severe visible bruising on her neck and the top of her hand. She was in so much pain that she was unable to pick up the children. She attributed her injuries to a fall in the shower, but DHS suspected that the injuries were inflicted by father.

E. DHS files termination petitions

DHS filed termination petitions on March 29, 2006. Shortly after that, mother requested marriage counseling. At first, father refused to agree to that service because he was in a new relationship and did not plan to reunite with mother. Father agreed to engage in marriage counseling a month later, however. The court lifted the no-contact order between the parents for the sole purpose of allowing them to engage in that service, although the court did not order the counseling and DHS made no referral for the service.
In the meantime, father's probation was revoked on the basis of his probation violation, and father was sentenced to 25 months of incarceration. He began serving that sentence on April 25, 2006. At that time, father was enrolled in a domestic violence program and had attended three group classes. He had also completed a drug and alcohol assessment but had not yet begun treatment. Father had also been attending supervised visits with the children. Although his attendance was good, the visitation center staff expressed concerns about his parenting abilities. They had to do most of the parenting, and father would focus almost exclusively on the oldest child but did not know how to appropriately converse with a child of three years of age. Father spoke to the child as if she were an adult. He talked to her about his finances, about his need for a new lawyer, about fixing automobile transmissions, about how much he planned to pay for a new trailer, and about a new friend that he had, whom he wanted to accompany him on his visits with the children.
Mother continued her visitation schedule after father's incarceration, and DHS voiced concerns about those visits. Visitation center staff observed that mother was overwhelmed trying to care for three small children and that mother let the oldest child run the show. Mother's conversations with the oldest child were not age-appropriate. According to the staff, she treated the child "like an adult." Mother talked to the child about mother's own feelings in inappropriate ways. She asked for the child's approval when attempting to set limits for the child, which the staff observed confused the child. As a result, the staff commented, the child was "in charge" of the visits.
Because mother's visits were not going well, DHS enlisted Gomez, a parenting consultant, to supervise mother's visits and provide her with parenting counseling. Gomez observed that, although mother was warm and affectionate and did not cause him concern for the children's physical safety, mother's parenting had a negative impact on the children's mental and emotional well-being. He explained that mother "struggled chronically with taking charge" of the visits and that she let the oldest child behave inappropriately, defy her authority, and threaten her. He noted that, when the child perceived that no one was in charge of the visits, the child stepped in and attempted to assume the role of parent, "start[ing] to direct * * * a way for the parent to parent." Gomez explained that the child did that because it was frightening for her to be in a situation in which no one appeared to be in control. In the meantime, he noted, the other children received little or no attention. He also noted that the oldest child sometimes attended to her younger siblings "in a way that really looks less like a big sister and more like a parent figure, helping with either her little sister or her brother, soothing her or comforting her if it appears that Mom isn't doing that." Gomez worked with mother for several months and did not see significant improvement in her parenting. He also believed that, for mother to successfully and *575 safely parent, she would need the presence of another adult on a regular basis.
Despite the no-contact order, mother and father continued to communicate while father was incarcerated. They actively sought to prevent the discovery of their communication.

F. The termination trial

At the eight-day termination trial in January 2007 (at which mother and father were each represented by court-appointed counsel), numerous witnesses testified to the foregoing chronology of events. At the time of trial, the children were ages 3, 2, and 1. Mother was living with her mother, and father was still incarcerated. Dragovich, the clinical psychologist who had evaluated mother and father, testified that the parents cannot safely parent the children, either alone or together. According to Dragovich, stability for mother is avoiding hospitalization. Mother and father also testified. They denied that any physical violence had ever occurred between them. Although both parents stated that they would separate from the other if required by the court, they expressed a desire to reunite and parent the three children together. They stated that they first needed marriage counseling to work through their "issues," although the only issue that mother identified was father's infidelity. Although DHS had not made a referral for the marriage counseling, a DHS staff member testified that the parents had received more services than any other client that that staff member knew of.
The trial court ordered the termination of mother's and father's parental rights based on unfitness under ORS 419B.504 and neglect under ORS 419B.506. The court found credible the testimony of Dragovich, and found not credible the testimony of mother and father. The trial court signed the judgment terminating mother's and father's parental rights on July 16, 2007. Father later appealed his probation revocation and moved to set aside the termination judgment on that basis.
During the pendency of the appeal, concerns were expressed about the accuracy of the transcription of the termination proceeding. We ordered a completely new transcript to be prepared from the audio recordings of the termination proceeding and then permitted the parties to submit supplemental briefing concerning the impact, if any, of any differences between the transcriptions of that proceeding.

II. ANALYSIS
Both parents appeal the termination judgment, asserting that the state's evidence was insufficient to support termination. Father also assigns error to the trial court's denial of his motion to set aside the termination judgment. He further contends that the court erred in proceeding to a termination trial without first holding a permanency hearing. Finally, father asserts that his trial counsel was inadequate for not objecting to the court's failure to hold a permanency hearing. We address each assignment of error in turn.

A. Sufficiency of evidence to support the termination

Mother and father contend that the state's evidence does not support the terminations of their parental rights. They challenge the sufficiency of the evidence of unfitness and neglect as grounds for the terminations, and also challenge the court's determination that the terminations are in the children's best interests. The state concedes that the evidence of neglect is insufficient, and we agree and accept that concession. Our focus, therefore, is whether mother and father are unfit and termination of their parental rights is warranted.
We review an order of termination de novo, ORS 419A.200(6)(b), giving considerable weight to the trial court's demeanor-based credibility findings, State ex rel. Juv. Dept. v. Geist, 310 Or. 176, 194, 796 P.2d 1193 (1990). When the basis of that termination is parental unfitness under ORS 419B.504, as it is in this case, we apply a two-part test. First, we must find that "the parent has engaged in some conduct or is characterized by some condition" that is "`seriously detrimental'" to the child. State ex rel. SOSCF v. Stillman, 333 Or. 135, 145, 36 P.3d 490 (2001) (quoting ORS 419B.504). A condition or conduct *576 can be seriously detrimental to the child based on harm that has yet to occur. State ex rel. Dept. of Human Services v. J.A.C., 216 Or.App. 268, 279, 172 P.3d 295 (2007). Second, the court must find that "`integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'" Id. (quoting ORS 419B.504). "`Reasonable time' means a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).
The state must prove unfitness by clear and convincing evidence, ORS 419B.521(1), and unfitness is judged at the time of the termination trial, State ex rel. Dept. of Human Services v. Rardin, 340 Or. 436, 447, 134 P.3d 940 (2006). ORS 419B.504 (2005), the version of the statute in effect at the relevant time, provided a nonexclusive list of factors to consider in determining whether a parent is unfit and whether the circumstances making the parent unfit are likely to change. The factors relevant in this case are:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"* * * * *
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.
"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."
ORS 419B.504 (2005). Even if a parent is unfit, we must also find that the best interests of the child is served by the termination of parental rights. ORS 419B.500.
Applying the foregoing principles, we agree with the trial court that the state proved by clear and convincing evidence that mother and father are unfit and that it is in the best interests of the children to be freed for adoption.

1. Parental fitness of mother

Mother has a diagnosed mental illness, schizoaffective bipolar disorder, that significantly impacts her ability to parent her children. ORS 419B.504(1) (2005). According to Dragovich, the symptoms of mother's mental illness and the resulting decompensations are dangerous to the children. In February 2005, mother was decompensating and took the children with her when she left the family residence as a result of domestic violence by father. When DHS located mother and the children, DHS took the children into protective custody because mother had not been properly caring for them.
Mother has a history of abusive relationships, and father has physically abused her in the presence of their children. Despite that, she plans to reunite with him and parent the children with him. Given that father has made no demonstrable progress in resolving his domestic violence issues, based on missed domestic violence classes and repeated instances of domestic violence against mother, it is highly probable that the children would continue to be exposed to domestic violence between the parents.
Mother's mental illness also presents a significant challenge to her ability to safely parent three young children. Even when mother is compliant with her medication, she struggles with the burden of being the primary caregiver for several children. After the two daughters were returned to the parents and DHS continued to provide extensive support services (more services, a DHS caseworker observed, than any other client that that staff member knew of), mother became "run down." Now there are three children. Mother asserts that she would be able to safely parent the children with the support of the county mental health department and DHS services. Mother, however, was receiving the support of county mental health and DHS when the children were returned to the *577 home in July 2005. Their circumstances nevertheless deteriorated, resulting in father's domestic violence against mother in the presence of the children and the children being removed from their care less than four months later.
Although mother is warm and affectionate with the children, Gomez characterized her parenting during supervised visits as endangering the children's mental and emotional well-being because mother cannot take charge in a way that reassures them that they are safe. Furthermore, as Dragovich testified, even when mother is taking her medications, "stability" for her consists of avoiding hospitalizations. That is not the stability the children need. We conclude that mother's condition and conduct are seriously detrimental to the children. Stillman, 333 Or. at 145, 36 P.3d 490.
We also conclude that it is improbable that the children could be integrated into mother's home within a reasonable period of time. ORS 419B.504 (2005). Despite several attempts to do so, mother has been unable to permanently separate from father, a person who has physically abused her in the presence of the children. She desires to reunite with him as long as he resolves what she considers to be the one issue that he needs to work onhis infidelity. Mother has participated in numerous services, but she has displayed little insight into and recognition of the physically abusive nature of her relationship with father.
Even if mother could separate from father, she does not have a stable living environment to which the children could be returned, and she has offered no plan to accomplish that. Furthermore, Gomez maintains that mother cannot parent the three children on her own without the regular presence of another adult. Even within the protected environment of supervised visitation, Gomez observed signs of fear in the children as a result of mother's inability to parent authoritatively. Mother has participated in parenting classes, has worked with DHS visitation center staff, and has engaged in several months of consultation with Gomez. Nevertheless, she has been unable to adapt her parenting skills to meet the children's needs, demonstrating that she will not be able to provide the children with the environment they need within the time period required.

2. Parental fitness of father

Father has a history of criminal conduct, alcohol abuse, and domestic violence. He has engaged in services, numerous times, related to alcohol abuse and domestic violence with limited success. According to Dragovich, father has gained very little insight into his abusive behaviors and minimizes the impacts that they have on others. Father points to the fact that he has had no new criminal convictions since the birth of the parents' oldest child. Father's consumption of alcohol, however, has resulted in two probation violations, one of which resulted in revocation of his probation and a 25-month prison sentence.
Father contends that that incarceration was unlawful and that it has deprived him of time to remediate the allegations of alcohol abuse and domestic violence. He filed a criminal appeal, in which this court affirmed the judgment without opinion on August 27, 2008. Since this case was submitted, the Oregon Supreme Court denied his petition for review of our decision. State v. Salmons, 222 Or.App. 213, 193 P.3d 629, rev. den., 345 Or. 460, 200 P.3d 146 (2008).
Father asserts that, by the start of his incarceration, he had taken steps to remediate his alcohol abuse and domestic violence; he had enrolled in a treatment program and had begun domestic violence classes. He also notes that he is participating in programs during his incarceration. Father previously participated in those types of programs, however, with little or no success. He voluntarily signed numerous service agreements with DHS, but repeatedly failed to follow through on those commitments.
Father's alcohol abuse remains untreated. He engaged in physical violence against mother in the presence of the children. He also demonstrated poor judgment by consuming alcohol in violation of the terms of his probation, resulting in arrests at the family residence and a lengthy incarceration sentence. Father's conduct and condition are *578 seriously detrimental to the children. Stillman, 333 Or. at 145, 36 P.3d 490.
It is also the case that father has not and will not be able to make the necessary changes to allow integration of the children into his home within a reasonable time. ORS 419B.504 (2005). It is true that father was enrolled in alcohol treatment and a domestic violence program at the time that he began serving his prison sentence and that he is participating in programs during his incarceration. Father has a history of poor performance in those types of programs, however, making it improbable that father will enjoy success in the time necessary for the children.
Furthermore, given their young ages, the children are likely to require parenting skills that exceed father's capacity. Even when the children were in the parents' care, father did none of the parenting. When mother and father were jointly visiting with the children, mother did all of the parenting. Once the parents began visiting the children separately, the visitation center staff took primary responsibility for parenting the children during father's visits. Father has participated in parenting classes with minimal success and has never demonstrated that he has the ability to parent the children, whether on his own or with mother.

3. Best interests of the children

We conclude that termination of mother's and father's parental rights is in the best interests of the children. The two older children have been removed from the parents' care twice; the youngest child has been with a foster family since his birth. The children are adoptable and currently living with their prospective adoptive family. The children, all under six years old, are at ages where it is important for each of them to develop an attachment to a caregiver. As we have noted, neither mother nor father has demonstrated an ability to safely parent the children, either alone or with the other parent. Given those circumstances, it is in the children's best interests to terminate mother's and father's parental rights. The trial court did not err in entering an order to that effect.

B. The denial of father's motion to set aside the termination judgment

Father also assigns error to the trial court's denial of his motion to set aside the termination judgment. ORS 419B.923 grants a juvenile court authority to modify or set aside one of its judgments. The statute sets forth a nonexclusive list of reasons why a court may do so: clerical mistakes in the judgment, ORS 419B.923(1)(a); excusable neglect, ORS 419B.923(1)(b); or newly discovered evidence, ORS 419B.923(1)(c). A court's denial of a motion to modify or set aside a judgment is reviewed for an abuse of discretion. State ex rel. Juv. Dept. v. D.J., 215 Or.App. 146, 155, 168 P.3d 798 (2007). If the court's decision was within the range of legally correct choices, then the court did not abuse its discretion. Id. It is appropriate for an appellate court to reverse a trial court's decision only when that decision "`exceeds the bounds of reason.'" Pro Car Care, Inc. v. Johnson, 201 Or.App. 250, 259, 118 P.3d 815 (2005) (quoting Ramsey v. Thompson, 162 Or.App. 139, 145, 986 P.2d 54 (1999), rev. den., 329 Or. 589, 994 P.2d 130 (2000)).
In this case, father contends that the court should have granted his motion to set aside the termination judgment because, after the termination hearing, he developed new "specific arguments" in support of his separate appeal of his probation revocation. He contends that, if he could succeed in obtaining a reversal of the probation revocation, it necessarily would follow that he was deprived of "fundamental fairness" in this case. As we understand it, father reasons that, if the probation revocation were to be reversed the assertion of which has now been rejected on appealthat would mean that he would have been unlawfully imprisoned during the termination proceeding and, consequently, unlawfully deprived of an opportunity to make a better showing of his minimal fitness as a parent in this case.
The state responds that nothing prevented father from developing the new "specific arguments" in his probation revocation appeal before the entry of judgment in this case. In particular, the state notes that father has identified no new evidence that he could not *579 have discovered earlier and that altered the nature of his appeal of the probation revocation. Under the circumstances, the state contends, it can hardly be said that the trial court in this case abused its discretion in denying father's motion to set aside the termination judgment.
We agree with the state. Father has offered no explanation for his failure to make at an earlier juncture the arguments that he later asserted in his probation revocation appeal. The circumstances related to the probation revocation were well known to father throughout the termination proceeding. Certainly, father has not established any of the grounds for a new proceeding identified in the statute; he has established no clerical error, no excusable neglect, and no newly discovered evidence. ORS 419B.923(1). Under the circumstances, we cannot say that the trial court abused its discretion in denying father's motion to set aside the termination judgment.

C. The failure to hold a permanency hearing

Father asserts that the trial court erred in proceeding to termination without first holding a permanency hearing. Father contends that the trial court should have held such a hearing to determine whether the permanent plan should be changed from reunification to adoption and that the failure to do so violated his statutory and due process rights. Because he did not preserve that contention at trial, father urges us to consider it now as plain error. ORAP 5.45(1). The state concedes that the trial court erred in failing to hold a permanency hearing in this case, although it contends that that does not necessarily mean that the trial court could not still proceed to termination. The state contends that, even assuming that the trial court erred in proceeding to termination, we should not exercise our discretion to review the error because the purposes of the preservation rule would not be served by reviewing it, because any error was harmless, and because it is not in the interests of the children to delay this case any further.
We again agree with the state. ORS 419B.470(2) provides, in part:
"[W]hen a child or ward is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier."
The "clear and convincing" standard required in a termination of parental rights proceeding does not apply in a permanency proceeding. State ex rel Juv. Dept. v. Brown, 175 Or.App. 1, 11-12, 27 P.3d 502, rev. den., 332 Or. 558, 34 P.3d 1176 (2001). In this case, the two older children were placed in substitute care in February 2005, but they were returned to the parents in July 2005. The children were again placed in substitute care in November 2005, at which point the court found the children to be within the jurisdiction of the court with respect to father. The parents' third child was placed in substitute care immediately after his birth in January 2006. Therefore, under ORS 419B.470(2), a permanency hearing for the two older children should have been held no later than January 2007, and no later than March 2007 for the youngest child. It is undisputed that no permanency hearing was ever held. Instead, the court held the termination trial in January 2007.
It thus appears that father is correct that the trial court erred in failing to conduct a permanency hearing. It does not necessarily follow from that, however, that the trial court erred in proceeding to termination without having held a permanency hearing. But, even assuming that father is correct in that regard, that does not end the matter.
The Supreme Court has instructed that, even when plain error occurs, "[a] court's decision to recognize unpreserved or unraised error in this manner should be made with utmost caution. Such an action is contrary to the strong policies requiring preservation and raising of error." Ailes v. Portland Meadows, Inc., 312 Or. 376, 382, 823 P.2d 956 (1991). Only in "rare and exceptional cases" should we exercise our discretion to review and correct an unpreserved error. State v. Gornick, 340 Or. 160, 166, *580 130 P.3d 780 (2006). Among the factors that we must consider are the nature of the case, the gravity of the error, how the error came to the court's attention, and whether the policies behind the rule of preservation have been served in some other way, for example, whether the court was given some other opportunity to avoid or correct the error. Ailes, 312 Or. at 382 n. 6, 823 P.2d 956.
In this case, we decline to exercise our discretion to review the court's failure to conduct a permanency hearing. To begin with, as the state notes, the interests of the children would not be served by further delay. More than two years passed between the filing of the initial dependency petition and the entry of the termination judgment. As the courts have recognized, children should not be required "to remain in the limbo of impermanent foster care * * * any longer than is absolutely necessary." Geist, 310 Or. at 187, 796 P.2d 1193.
Moreover, father has not demonstrated any harm that resulted from the failure to conduct a permanency hearing. His only argument was that a permanency hearing would have provided him better notice that the state might seek to terminate his parental rights. Given the length of time that DHS had been involved with father and the family, and the fact that nine months elapsed between the filing of the termination petition and the termination hearing, we conclude that father was not deprived of sufficient notice or time to prepare for the hearing. In addition, in the termination proceeding itself, father was afforded extensive procedural rights. In particular, as we have noted, the standard of proof in termination proceedings is higher than in permanency proceedings. And, although the substantive inquiries in permanencyas opposed to termination proceedings are not precisely identical, they are similar. In all events, father has not argued that any differences in the substantive standards is the source of any harm to him in this case.

D. Adequacy of father's trial counsel

Father's final contention is that his trial counsel was constitutionally inadequate for failing to request that the trial court hold a permanency hearing before proceeding to trial on the termination. The state disputes that father's counsel was constitutionally inadequate. In any event, the state argues, because the termination trial was a fundamentally fair proceeding, father suffered no prejudice as a result of his representation at trial.
Indigent parties to a juvenile proceeding have a right to court-appointed counsel under ORS 419B.518. That right to counsel includes a right to adequate counsel. Geist, 310 Or. at 185, 796 P.2d 1193. The standard of adequacy is whether a juvenile proceeding was "fundamentally fair." Id. at 187-88, 796 P.2d 1193 (citing McKeiver v. Pennsylvania, 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971)). Such "fundamental fairness requires that appointed counsel exercise professional skill and judgment." Geist, 310 Or. at 190, 796 P.2d 1193. In determining whether counsel exercised such skill and judgment, the Oregon Supreme Court has advised that "[t]here may be many ways to properly represent a client in any given case." Id.
In this case, father contends that his attorney was inadequate for failing to object to the court holding a termination trial without first holding a permanency hearing. As we have already noted, a permanency proceeding imposes a lesser burden of proof on the state than a termination proceeding. Father does not contend that failing to hold a permanency hearing deprived him of a full and fair opportunity to contest the state's evidence of his unfitness. Indeed, father's attorney may well have made a strategic choice not to press for a permanency hearing. Consequently, we cannot say that his attorney was inadequate.

III. CONCLUSION
The state's evidence was sufficient to prove that both mother and father are unfit by reason of conduct or condition seriously detrimental to the children and that integration of the children into the parents' homes is improbable within a reasonable period of time. It is in the children's best interests to be freed for adoption. Because we have *581 rejected father's other assignments of error, we affirm the trial court's judgment terminating the mother's and father's parental rights.
Affirmed.