Argued and submitted April 20, reversed and remanded July 13, petition for review denied October 20, 2011 (351 Or 254)

In the Matter of C. R. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. P.,
*Appellant.*

Jefferson County Circuit Court
00383354
Petition Number 09JV0172
A147224 (Control)

In the Matter of H. G. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. P.,
*Appellant.*

Jefferson County Circuit Court
00373851
Petition Number 09JV0171
A147225

260 P3d 654

Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Kristen G. Williams, Assistant Attorney General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Rosenblum, Senior Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Mother appeals judgments terminating her parental rights to her two young daughters, HL and CP, entered two years after she, at the age of 19, killed the children's father during a domestic dispute. The Department of Human Services (DHS) took custody of HL shortly after the incident and of CP shortly after her birth several months later. Mother ultimately pleaded guilty to criminally negligent homicide and was sentenced to 60 months' imprisonment. The children were initially placed in the care of mother's sister (DP), but after 13 months DHS elected to move them to live with their paternal grandmother in Washington State. The juvenile court terminated mother's parental rights on the grounds that she was unfit due to alcohol abuse, domestic violence, and her continued incarceration. On *de novo* review, ORS 19.415(3)(a), we conclude that the record lacks clear and convincing evidence that mother's past alcohol abuse and the domestic violence that characterized her relationship with father renders her presently unfit. We also conclude that mother's continued incarceration does not provide a basis for termination under the circumstances presented here. Accordingly, we reverse.

We begin by reviewing the pertinent facts as we find them, addressing first mother's relationship with father and the incident that led to her incarceration. We then address mother's background and the evidence regarding whether she is presently unfit. Finally, we address the evidence regarding the children.

Mother met father in the summer of 2006 when she was 16 years old. They quickly became a couple, and she gave birth to HL the following spring. The relationship between mother and father was volatile from the beginning. The arguments between mother and father frequently turned violent, and father physically assaulted mother on several occasions.

Although mother estimated that father struck her about 10 times over the course of their relationship, we recount only the specific incidents about which mother testified about at trial. Mother secured a restraining order in September 2007 after an incident in which father threatened

her with a baseball bat, broke down a locked door with the bat, and then, after dropping the bat, struck mother in the eye. Mother, however, maintained contact with father while the restraining order was in place, and during that period father and mother again were involved in an argument that turned violent. During the course of that argument, father slapped mother and grabbed HL so that mother would not leave. When mother attempted to leave, father chased her down the street while holding HL and slapped mother repeatedly. A few weeks later, when father indicated to mother that he was going to turn himself in to authorities because of an outstanding warrant, she agreed to drop the restraining order so that she could visit him in jail. She voluntarily dismissed the restraining order in January 2008.

Several months later, father struck mother while she was cooking and began to choke her. Mother scratched him and grabbed the knife she was using to cook with. Father "backed off" and told her to put the knife down, but stopped coming after her. Mother was surprised that the knife scared father.

On the night of father's death in July 2008, mother and father argued about putting HL, then 14 months old, to sleep. Mother had been drinking that night and was trying to wean HL in any event, so she did not want to breastfeed HL to soothe her to sleep. Father insisted that mother do so. During the argument, father struck mother and knocked her mobile phone out of her hand. When mother walked towards HL, father pushed mother down, and mother told father that he "wouldn't be acting so bad if I had a knife in my hand." Father urged her to get a knife, and mother proceeded to pick up HL and grab a kitchen knife.[1] At some point, father was holding the knife, and father's uncle was standing between them trying to calm them down. Father stated, "Here, take the knife," and gave it to mother. She "swung it over [father's] uncle's shoulder," and it entered father's chest. Mother called 9-1-1, then called DP, and then called 9-1-1 again when father stopped breathing. Father died from the stab wound

---

[1] There is some evidence that father's uncle was holding HL during the fatal confrontation, but mother, while confessing some uncertainty in her memory as to the events of that night, believes that she held HL during the fight.

and mother was taken into custody. DP took HL home with her that night, and she remained in DP's care for 13 months.

Mother was indicted on charges of first-degree manslaughter, ORS 163.118, and incarcerated in Jefferson County Jail while awaiting trial. She learned shortly after her indictment that she was pregnant with father's child. She gave birth to CP at the county jail in February 2009, and DHS immediately took custody of CP and placed her in the care of DP. The juvenile court took jurisdiction over HL in September 2008 and CP in June 2009.

In early 2009, a DHS adoption committee approved the children's paternal grandmother as their adoptive resource, although DP had also sought to adopt them. Both children stayed with DP until August 2009, when DHS changed the permanency plan to adoption, identified grandmother as the adoptive resource, and placed the children with her in Washington State.

Mother pleaded guilty to, and was convicted of, criminally negligent homicide in February 2010. She was sentenced to 60 months' imprisonment with credit for time served, and three years of post-prison supervision. Mother was prohibited from receiving any good time credits, early release, or alternative incarceration programs. She was transferred to Coffee Creek Correctional Facility in March 2010 and is eligible for release in July 2013.

We proceed to address mother's background and the evidence regarding present unfitness. Mother was exposed to domestic violence in the home in which she grew up. She testified that her father physically and verbally abused her and her mother, and that he was incarcerated during her teenage years for stabbing her mother's boyfriend. When mother's father went to prison for that attack, mother dropped out of high school to avoid the embarrassment of facing her peers, and she obtained her general equivalency diploma.

In November 2008, while in the county jail, mother participated in a comprehensive mental health assessment. She admitted to using alcohol on a regular basis starting when she was 13 years old until she became pregnant with HL. She also admitted to using methamphetamine heavily at

the age of 15 and cocaine and marijuana on a few occasions before the pregnancy. However, alcohol was her "drug of choice." She admitted to drinking to the point of intoxication three times in the two weeks before her fatal confrontation with father. During the assessment, mother indicated that she did not believe that she needed mental health or substance abuse treatment. However, she acknowledged suffering from anxiety and depression, which she attributed to her incarceration and the circumstances leading up to it. The evaluator tentatively diagnosed her with depressive disorder, generalized anxiety, alcohol dependence, cannabis abuse, cocaine abuse, and methamphetamine dependence, and opined that mother would benefit from treatment and therapy. However, no services were available to mother at the Jefferson County Jail, and DHS was relieved of making reasonable efforts in December 2009.

Mother testified at trial about her past drinking and drug use. She indicated that she had quit drinking while pregnant, and she testified that after HL was born, she "went to maybe ten parties and * * * drank at the parties." She indicated that the night of father's death was the only occasion that she had consumed alcohol in HL's presence. She acknowledged that she has a problem with alcohol, as do many members of her family, and that she has become more aware while in jail about the problems that alcohol has caused in her life. Since her transfer to Coffee Creek, she has attended several Alcoholics Anonymous meetings, and she expressed the intention to abstain from drinking alcohol after her release from prison. She also has arranged to attend a substance abuse treatment program at Coffee Creek when she is eligible to do so, during the last six months of her prison term.

Mother held three part-time jobs in the months before her incarceration in an effort to support herself and HL and was well thought of by her employers. Although father provided some money to help her rent the house where she lived, he did not contribute on a regular basis. At the time of trial, mother was employed in the kitchen at Coffee Creek and participated in a "Toastmasters" group. She also stated an intention to enroll in an "entrepreneur's class" at the

prison and expected to begin one-on-one counseling with a therapist at the prison in the near future.

Dr. Sebastian, a licensed psychologist, evaluated mother "with regard to her parenting" after her arrest in 2008 and again shortly before the termination trial. Generally, Sebastian testified that mother demonstrated the ability to parent her children. In particular, Sebastian testified that mother, "unlike probably most of the people that I see who come to termination[,] * * * has insight into her children's situation. She has gained a lot of insight into herself." She noted that mother "is in treatment * * *. She has a desire to change * * * and she has the intellectual ability to be able to handle parenting." Sebastian remarked that, before her incarceration, mother did "her best" to support HL, despite her low socioeconomic status and young age. Further, mother has demonstrated an interest in gaining skill and an education to assist in her transition out of prison and has had no incidents of aggression or acting out in prison.

As for potential impediments to mother resuming her duties as a parent, Sebastian testified that mother does not suffer from any personality disorder or other disorder that would prevent her from parenting adequately, and that although mother abused substances during her teenage years, she does not now exhibit signs of dependence or addiction. Further, mother now has a better understanding of "what domestic violence is" and, with therapy and education, she can learn about "making good choices about relationships." Sebastian acknowledged that mother exhibited signs of a major depressive disorder in 2008 and that mother still was not sleeping well at the time of trial. However, Sebastian opined that, with assessment and therapy, such depression was treatable and manageable and should not provide an impediment to parenting.

Finally, Sebastian was asked generally about a child's primary attachment years. She opined that the first five years are the most important for a child in terms of attaching to a primary caretaker, and that "we know that children have the capability of attaching to more than one primary caregiver, but we're never sure how many you can do after one or two primary caretakers."

Mother testified that her plan for the children if her parental rights are not terminated is to slowly transition them back into her care after her prison term ends. She expressed concern that removing the children from their grandmother's home and returning them to mother would be difficult on the children, but she was hopeful that they could adjust.

Currently, the children, now ages four and two, are not attached to mother. Mother has not seen HL since father's death when HL was a year old. The court approved DHS's decision not allow visits between HL and mother at the county jail because the jail did not allow "contact" visits and DHS staff determined that it would be harmful to HL to see mother "through a glass." Initially, DP brought CP for visits at the county jail, and mother saw CP a few times after the child was moved to Washington, but has not seen her since October 2009.

We turn to the evidence regarding the children. There is little in the record about the period when the children were in DP's care, other than a suggestion that they were bonded to her. The bulk of the evidence relates to the time between placement with their grandmother and the termination trial.

The children's DHS caseworker testified that she first visited the children in August 2009. During the first visits, CP was an infant and showed no concerning issues, but HL was "very aggressive" toward the caseworker and showed signs of "attachment issues." The caseworker referred HL to "parent-child intervention therapy" with Connie Au at the Children's Response Center. The caseworker testified that, since that initial meeting in August 2009, she has seen the children monthly and HL's behavior "has improved so much." While HL "still has tension here and there, * * * she is easily redirected"; she "still tends to be a little aggressive at times, but more so in the typical age range." CP, for her part, is "doing great." Both kids are "healthy" and bonded with grandmother and feel "safe" around her. They do not ask about other family during the caseworker's visits.

Au, HL's therapist, testified that she first saw HL and CP shortly after they moved to live with grandmother.

HL had returned from a visit to DP's home over a long weekend and exhibited temper tantrums and prolonged crying and behaved aggressively toward CP. Au was concerned that HL did not have a basic ability to soothe herself and that she needed time to bond with grandmother in her new environment.

Au's testimony as to the potential causes for HL's behavior was equivocal, noting that HL's overall history of exposure to domestic violence, the death of her father, and multiple moves (from her parents to DP to grandmother) all could have contributed to her inability to regulate her emotions. Au initially diagnosed HL with an adjustment disorder stemming from changes of caregiver and changes of home environment over the first two years of her life. She considered the possibility that HL suffered from post-traumatic stress disorder that may have been attributable to witnessing her father's death, but ultimately Au declined to make that diagnosis because she could not say definitively that HL's "behavior problem is caused by * * * trauma." Nevertheless, Au recounted an incident during an early therapy session in which HL used a toy knife to stab a toy "man figure" and afterwards indicated that she was mad at Au. Although Au could not definitively attribute HL's behavior to domestic violence, she indicated that, in her training and experience, HL's behavior was consistent with that of other children who have been traumatized.

When asked how much of HL's behavior could be attributed to an unstable home life, Au testified that she

> "lacks—there's a lack of opportunity for her to learn that— to learn emotional soothing in the environment. Somehow her environment has been disrupted repeatedly, with not enough adult attention for her to master those skills, the emotional stability skills."

Although Au did not provide therapy to CP, she observed that CP was interactive, attentive, and comfortable in grandmother's home.

Au also testified about the children's need for permanence. She opined that, for a child with HL's history, the best thing is

"for her to settle and stay in one home. If she is in a home where she can thrive right now, and she's already developed routine and stability, the best thing for her is to stay in that environment, unless that environment is life frightening or abusive.

"If this environment she is in right now is nurturing and stable, then [HL] can start from here, you know, and just like in the last year I already observed many improved—many, many good progress and improvement in her behavior. To keep changing her is not a good option for her."

Au was asked, "[W]hat if [HL] had to wait three years for a caregiver, a change in caregiver, and that home was one where domestic violence regularly occurred?" Au responded,

"Well, I would prefer no children in a domestic violence environment, you know. Even children that came from a stable home environment that have separation from parents have good childhoods, and then suddenly placed in a domestic violence environment, that child will be impacted."

Au testified that if HL is

"uprooted again and go[es] to an environment potentially somewhat domestic violent * * * it would not be a good scenario for [HL] in her childhood development.

"* * * * *

"But if she leaves grandma and then all of a sudden goes to another household to be raised in another household, so means there are pretty much like three disruptions of caregivers and home environments for [HL] in such a short timeframe. So there is a possibility that she may lose all her learning, I mean her learning—her bonding with an adult, and with the bonding with an adult is she trusts—that is her trust in human relationships."

As for whether CP was subject to the same types of risks, Au acknowledged that CP presented different issues because of her age and because she did not witness her father's death. Au did, however, explain,

"So [CP] went to [DP's] home for a few months. She was still an infant. So for [CP] changes in the first twelve months, it was like two times, you know, and then now she

stayed with her grandma—I think her placement with grandma is like the longest time in her life. So of course, you know, another move could cause confusion, you know, for [CP]."

Finally, Au testified that the transitions for the children from DP's home in Oregon to the paternal grandmother's home in Washington was "very, very difficult" but that HL's behavioral issues have subsided and she is "more like a regular two, three year old child right now."

We proceed to our analysis. The trial court terminated mother's parental rights based on unfitness pursuant to ORS 419B.504, which provides, in pertinent part:

"The rights of the parent * * * may be terminated as provided in ORS 419B.500 if the court finds that the parent [is] unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)  Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child * * * for extended periods of time.

"(2)  Conduct toward any child of an abusive, cruel or sexual nature.

"(3)  Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"* * * * *

"(6)  Criminal conduct that impairs the parent's ability to provide adequate care for the child * * *."

Accordingly, the state has the burden of proving, by clear and convincing evidence, that the parent is unfit because the parent engages in conduct or is characterized by a condition that is seriously detrimental to the child and it is improbable that the child can be integrated into the parent's home within a reasonable time because the conduct or condition is unlikely to change. *State ex rel SOSCF v. Stillman,*

333 Or 135, 145-46, 36 P3d 490 (2001). "Evidence is clear and convincing if it makes the existence of a fact 'highly probable' or if it is of 'extraordinary persuasiveness.'" *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (quoting *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003)). The fitness of the parent is measured at the time of the termination trial. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006).

The trial court found mother to be unfit because she "repeatedly exposed [HL] to the physical danger and emotional abuse of domestic violence" resulting from mother's failure to address both her substance abuse issues and the "cycle of violence behaviors within the home of her family of origin and her home with [father]." The court noted that mother's condition "led to the criminal episode where she deprived the children of their father by killing him and their mother because she was sentenced to serve 60 months of incarceration." The court further found that CP had "never known" mother and that HL had not seen mother in the 26 months preceding the termination trial and that mother will be unavailable to parent the children for at least an additional 34 months. Given that the children are bonded with grandmother and "[o]nly the stability of a safe and nurturing environment will allow the children to develop positive bond[s] and appropriate behavior norms[,]" the court concluded that to disrupt their placement would "have an adverse impact on the children."

On appeal, mother argues that DHS failed to prove that she was unfit because the agency failed to prove that she is characterized by any seriously detrimental conduct or condition that persisted at the time of trial. She frames the heart of DHS's case as follows: One domestic violence incident led to mother's incarceration, which made her unavailable to parent for such an extended period that it was likely to be seriously detrimental. In response, mother asserts that her expert evaluation indicated that she is free of personality disorders associated with domestic violence, that she does not require drug and alcohol treatment, and that she is likely to be capable of safely and adequately parenting her children

upon her release. Further, mother contends that the psychological evidence of HL's behavior problems did not definitively establish that mother's conduct or condition caused those problems. That is, HL's behavior problems were related to the transition from DP's home to grandmother's home, and the only evidence that mother's incarceration was detrimental was an observation that HL had trouble adjusting to the move to grandmother's home. Mother also notes that there is no evidence that CP exhibited troubling behaviors.

The state counters that mother's five-year incarceration, her unresolved domestic violence history, and her untreated alcohol dependence render her unfit to parent the children. Further, the state contends that because of her incarceration, mother will be unavailable to parent her children during their primary attachment years, and that because HL already suffers from an "attachment disorder"[2] caused by mother's incarceration and both children need permanency as quickly as possible, mother's conduct or condition is seriously detrimental to the children. Moreover, because mother has three years remaining on her sentence from the time of the termination trial, integration is improbable within a reasonable time. The state contends that even if mother's unresolved alcohol dependency and domestic violence issues are not enough standing alone to render her unfit, she is unfit when those issues are combined with her five-year incarceration.

Initially, we emphasize that unfitness is assessed at the time of trial. Based on the evidence adduced at trial, we agree with mother that the state failed to prove that she was unfit due to her "untreated" alcohol dependence and "unresolved domestic violence history." Sebastian's evaluation of mother revealed self-awareness about the problems that alcohol and domestic violence have caused her and her children and mother's credible intention to engage in services to prevent a recurrence of those problems. Services were unavailable to her during her lengthy incarceration in the Jefferson County Jail, but since her transfer to Coffee Creek,

---

[2] The record does not support DHS's references to an "attachment disorder." Au diagnosed HL with an "adjustment disorder," and HL has not received any other diagnosis.

mother has attended Alcoholics Anonymous meetings and has sought individual counseling. Sebastian saw every reason to believe that mother would continue to benefit from services and increase her self-awareness. Mother has not been diagnosed with any personality disorders that would tend to precipitate a pattern of domestic violence, and she has had no incidents of aggression or acting out in prison. Although the record shows *past* incidents of domestic violence and substance abuse by mother during her teenage years, there is little to no evidence, let alone clear and convincing evidence, that mother's past problems with those issues persisted at the time of the termination trial.

That leads us to the only remaining basis for the trial court's finding of unfitness: mother's incarceration. In *Stillman*, the Supreme Court concluded that, although incarceration does not constitute "criminal conduct" under ORS 419B.504(6), incarceration and its consequences for children are within the "purview of the court." 333 Or at 147-48. That is, incarceration is a "condition" that, "if it were seriously detrimental to the children, would be sufficient to warrant a finding of unfitness[.]" *Id.* at 149 (emphasis omitted).

Accordingly, in *Stillman*, the court evaluated whether the father's unfinished incarceration and the period of time that he would be required to spend in a halfway house after his prison term expired were seriously detrimental to the children. *Id.* The record in *Stillman* showed that the children were generally well adjusted and happy and the only "detriment" was related to the "children's worry about their parent's well-being and the uncertainty surrounding the termination proceeding itself." *Id.* The court concluded that the level of anxiety that the children experienced in that case was not the "sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit," noting that " '[t]he reason for terminating parental rights ought to be related to the parent's conduct as a parent.' " *Id.* at 152 (quoting *Simons et ux v. Smith*, 229 Or 277, 280, 366 P2d 875 (1961); brackets in *Stillman*). The court also noted that the father retained a strong relationship with the children, in part due to a strong extended family structure. Although the father was unavailable to parent for many months, the court concluded that the termination of his

rights was unwarranted in light of the fact that the children were relatively happy and well-adjusted, any anxiety they were feeling was not the sort of serious detriment that provided a basis for terminating parental rights, and the father had a strong extended family and a strong relationship with the children. *Id.* at 150-52.

Likewise here, the question we must answer is whether mother's incarceration for 34 months following the termination trial causes the type of detriment to HL and CP that the legislature contemplated as providing the basis for a conclusion that she is unfit. *See id.* at 152. Although we are mindful that, in a general sense, prolonged incarceration could be seriously detrimental to children, we do not find the evidence here to establish clearly and convincingly that mother's incarceration for an additional 34 months is seriously detrimental to HL and CP.

The focus of the evidence of detriment to the children is two-fold. First, HL suffered from behavior issues "outside the norm" for her age when she was moved from DP's home to grandmother's home. As a result, the child's therapist diagnosed her with an adjustment disorder. There is no similar evidence as to CP. Second, there was general testimony that the first five years of a child's life are the "primary attachment years" and that moving HL and CP to another primary caregiver at the end of mother's incarceration could cause HL to regress and could cause CP confusion.

We agree with mother that the evidence relating to HL's problems transitioning from DP's home to grandmother's home is not clear and convincing evidence of serious detriment. In finding that the anxiety the children in *Stillman* were experiencing was not sufficient to justify termination, the Supreme Court noted that such anxiety is not extraordinary in the juvenile system. *Id.* at 152. Likewise here, difficulty adjusting to a placement move is not extraordinary in the juvenile system—or, indeed, for many other children (including those whose parents are engaged in military service abroad). Moreover, here, the most recent placement move was not the result of mother's conduct but rather

of DHS's decision to move the children from a placement that was, by all accounts, stable.

Further, while the record is replete with general statements about the risks of uprooting these children during their primary attachment years, we do not find here clear and convincing evidence that such a change would be seriously detrimental. By all accounts, the children are in a stable placement and are doing well. Sebastian noted that children can attach to more than one primary caregiver, but that it is unclear how many attachments children can form after one or two primary caretakers. The record in this case does not connect HL's "adjustment disorder" with any future potential placement changes. Rather, the evidence is much more equivocal, and although we acknowledge reason for concern about changing the children's placement in the future, we do not view the evidence of HL's adjustment issues and the general testimony about "primary attachment years" to rise to the level of clear and convincing evidence—that is, evidence that makes the existence of a fact "highly probable" or that is "of 'extraordinary persuasiveness,' " *A. M. P.*, 212 Or App at 104—of serious detriment caused by mother's incarceration.

Moreover, the Supreme Court has stated that "the reason for terminating parental rights ought to be related to the parent's conduct as a parent." *Stillman*, 333 Or at 152. And, although DHS must act under statutory timelines to achieve permanency, those actions contributed to the current situation in this case. Mother was immediately prohibited from seeing HL by DHS, and the move to Washington effectively eliminated any chance for mother to establish a relationship with CP. Moreover, one of the two changes in primary caregivers was a result of DHS's decision to move the children from a stable placement to a distant placement, yet DHS attributes to mother the issues caused by the move. *See State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 446, 134 P3d 940 (2006) (noting that DHS would not permit father to establish a relationship with the child when evaluating whether the father's conduct was seriously detrimental); *Stillman*, 333 Or at 151 (noting that the children's anxiety was caused in part by DHS prohibition against contact

between the father and the children). DHS is responsible for making decisions regarding the welfare of children in its custody, but the consequences of those decisions should not necessarily be attributed to the parent in every instance.

In sum, in light of the high evidentiary standard, we do not find that mother's continued incarceration renders her unfit to parent HL and CP.

Reversed and remanded.