Argued and submitted December 10, 2012, affirmed March 20, 2013

In the Matter of M. R. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

F. L. B.
and R. J. B.,
*Appellants.*

Marion County Circuit Court J100271;
Petition Numbers
041511BRU1, 041511BRU2;
A150795 (Control)

In the Matter of J. A. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

F. L. B.
and R. J. B.,
*Appellants.*

Marion County Circuit Court J100272;
Petition Numbers
041511BRU3, 041511BRU4;
A150798

298 P3d 626

Tracy A. Prall, Judge. (Judgments entered January 20, 2012)

Audrey J. Broyles, Judge pro tempore. (Judgments entered January 27, 2012)

Holly Telerant, Deputy Public Defender, argued the cause for appellant F. L. B. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant R. J. B.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Haselton, Chief Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Mother and father appeal judgments terminating their parental rights to two children, M and J. The juvenile court first took jurisdiction over those children after father was accused of sexually abusing his 13-year-old stepdaughter B, who is mother's daughter and the half sister of M and J. Mother and father were incarcerated shortly after B disclosed the abuse in April 2010—father on charges related to the sexual-abuse allegations and mother on charges of criminal mistreatment and of violating an official's duty to report child abuse, both related to her failure to immediately report father's abuse of B. In addition, mother later was indicted on two counts of perjury associated with her testimony at a hearing related to the charges against father. As discussed in more detail later in this opinion, mother and father eventually were convicted of all those crimes. Father received a lengthy sentence on his convictions and will not be released from prison until the year 2050. The sentences on mother's convictions included prison terms and, as of mid-2011, she was scheduled to be released in October 2012, although her "maximum" date was in February 2013.

The Department of Human Services (DHS) petitioned for termination of the parents' parental rights in April 2011, and the case was tried in September and November of that year. The juvenile court terminated both parents' rights, finding that father had sexually abused B for nearly a year and that mother had "failed to do anything to protect" B despite having been aware for months that father's relationship with B "was not appropriate." On *de novo* review, ORS 19.415(3)(a),we concur with the juvenile court's finding that father sexually abused B over an extended period, and we affirm the court's termination of his parental rights to M and J without further discussion. For the reasons set out below, we also affirm the juvenile court's termination of mother's parental rights with respect to those children.[1]

---

[1] Mother's parental rights to B are not at issue in this case.

## I. THE FACTS

We find the following facts on *de novo* review. ORS 19.415(3)(a). We discuss them in some detail because our resolution of this case turns largely on our factual determinations and our resolution of the parties' disagreement about certain events.

A. *The family, father's abuse of B, and the criminal prosecution of the parents*

Mother has one child, B, from a previous marriage, and mother married father when B was almost five years old. Mother and father had two children together: M (a girl born in 2002) and J (a boy born in 2004).

Mother, father, and the three children (B, M, and J) used to live in Stayton, but they moved to Salem sometime in late 2009 or early 2010. Father had a photography business. Mother worked as a classroom instructional assistant for special-needs children. Accordingly, she was obligated, like other public or private officials, to inform DHS or a law enforcement agency if she had "reasonable cause to believe that any child with whom [she came] in contact [had] suffered abuse." ORS 419B.010(1). Mother received training on her "mandatory reporter" obligations and had been told that if she suspected child abuse, she needed to report it to DHS and to law enforcement.

Mother broke her leg in late 2008 or early 2009 and had multiple surgeries as a result. Mother took what she characterized as "a huge amount of medications" after those surgeries, including medications to treat pain, depression, and anxiety. After mother broke her leg, B started assisting father in his photography business.

In Salem, the family lived in a three-bedroom house, but the children usually slept on couches in the living room, which was adjacent to the parents' bedroom. The children also played video games in the living room, and B generally stayed up late playing those games with father. Father first touched B sexually in the spring or summer of 2009, when she was 13 years old, and he repeatedly abused her over the next several months. The abuse, which included intercourse and oral sex, usually occurred at night in the living room,

when mother was asleep in the parents' bedroom. Father told B "a lot of times" that the family would be split apart if she revealed what was happening. Nonetheless, B thought of father as "[s]omething like" her boyfriend. Father continued to subject B to sexual abuse until one night in April 2010, when (as detailed later in this opinion) mother found him and B in a compromising position. Mother later told a coworker what she had seen, and the coworker passed that information on to the police.

By late 2009, mother had suspicions about father's relationship with B. According to her own later statement to a law enforcement officer, mother had walked in on father and B in an "awkward situation late at night in the living room" in November or December of that year. Deanna Pierce, who worked as an instructional assistant with mother, testified that mother had "suspected for a very long time" that B and father had an inappropriate relationship; mother had "made little suggestions here and there" to Pierce, but not, before April 2010, to the extent that Pierce thought she had a duty to report what mother had said. For example, mother told Pierce about having gone into the living room one night to find father sitting in his recliner, wearing a bathrobe with nothing underneath, and B sitting on the floor next to him. "And when she walked in [B] just kind of shot up, but they denied it." Mother told Pierce that "she ended up getting drunk because she – she didn't want to acknowledge that she actually walked in on that." Pierce described mother as being "very jealous at times" of B because of B's close relationship with father.

B, too, testified that she and mother had discussed the nature of B's relationship with father sometime in early 2010, before the final event in April of that year. Mother told B that she was uncomfortable with the closeness between B and father, and she used the word "inappropriate" in describing that relationship. Mother also expressed her discomfort with the relationship either to or around father. B testified that she heard mother say "that she thought she saw something happening between [father and B]," and father responded that mother was "just crazy" and was "just smudging" father and B to make herself feel better. B agreed when mother's lawyer asked whether father was "trying to

manipulate [mother] to just sort of not know what's going on." B does not think that mother tried to protect her from father, but B also is not sure that mother could have done anything to help, as she "wasn't doing that well" mentally at the time, and father was telling her that she was crazy.

The last incident of abuse occurred on about April 20, 2010, when father and B touched each other sexually in the family's living room. We credit B's testimony about that event, which—as corroborated by Pierce's testimony about mother's subsequent statements and B's later statement to police—establishes what mother observed that night. When mother walked into the living room, father and B were sitting in separate chairs, but mother saw that father was bent over B, whose shorts were pulled down or to one side, exposing her pubic hair. Mother told B to go to her room, and later came to talk to her, asking her to disclose what had happened. At that point, B testified, she thinks that she "was denying everything." Over the next couple of days, mother tried to get B to tell her more, and B revealed some of what had happened, eventually disclosing details of the sexual abuse. B also told mother that she would kill herself if mother told police officers what father had done.

The next day, mother told Pierce, her coworker, that she had "walked in on" father and B together the night before and "that everything she suspected was true." Mother asked Pierce "over and over" to swear that she would never tell anybody, "otherwise, they'll take my kids from me." Pierce did report the abuse to a school resource police officer, but not until several days later. Sometime before Pierce went to the police, mother took B to a doctor. Mother told the doctor that B had been sexually active, but did not disclose that father had abused B. The doctor prescribed an antidepressant for B and performed a gynecological examination. Mother also arranged for B to speak to school counselors because she was having thoughts of self-harm.

After Pierce reported what mother had told her, police sergeant Bennett, who specializes in child sex-abuse cases, was assigned to investigate the allegations. He inter-viewed B, who initially was upset and nervous, but who eventually disclosed that she had a sexual relationship with

father starting in the summer of 2009. B also told Bennett about the night in April 2010, explaining that mother had caught her and father in an awkward situation in the living room, and that mother had seen "that her shorts had been pulled to one side and her pubic hair was exposed."

Bennett contacted DHS, which took custody of B and sent her, and later M and J, to Liberty House for an evaluation. Bennett also interviewed mother who, after being given *Miranda* warnings, agreed to talk to him about what she knew of the relationship between father and B. Mother told Bennett about the April 2010 incident and said that B and father both had told her about what had happened. Mother also told Bennett that she had kicked father out of the house, "to some kind of trailer or camper," but brought him back to the house the next morning and performed oral sex on him. Bennett perceived mother to be concerned merely about herself; he testified that "it was apparent in her demeanor that there was some type of definite jealousy between her and [B] over [father]." Mother indicated to Bennett that she thought B was partly at fault.

Mother told Bennett that she had not reported the abuse because she did not want DHS to get involved, did not want to lose her children, and did not want father to get in trouble. She acknowledged that she was aware of her obligations as a mandatory reporter and had failed to follow through on them. She also said that she had not reported the abuse because B might harm herself and "she didn't think that [B] could withstand the scrutiny of the situation." During Bennett's investigation, however, mother cooperated and agreed to make a pretext call to father. During that call, the parents discussed the fact that father had been having a sexual relationship with B.

Bennett reported the abuse to DHS on April 27, 2010, and informed the agency that mother and father both would be arrested that day. Father subsequently was charged with multiple counts of sodomy, sexual abuse, and other crimes associated with his abuse of B. In May and July of 2010, father attempted to induce B to recant her accusations and to testify falsely or unlawfully withhold testimony against him; he subsequently was charged with

three counts of witness tampering. Father eventually was convicted of all charges and given lengthy sentences; he is scheduled to be released from prison in 2050.

Mother was charged with criminal mistreatment, for having withheld necessary and adequate physical care from B in April 2010, and with violating the duty of an official to report child abuse. In June 2010, she pleaded guilty to those charges and received a sentence that included a 13-month term of incarceration. That sentence was a dispositional departure from the presumptive probationary sentence.

Four months later, at an October 2010 hearing in father's criminal proceedings, mother testified falsely under oath, apparently regarding whether she had consented to the recording of the pretext call that she made to father at Sergeant Bennett's direction and regarding whether B had told her about the abuse. She later entered no-contest pleas to two counts of perjury based on that false testimony.[2] Mother received 14-month sentences on each of those counts, with seven of the months on the second count to be served consecutively to the 14 months on the first; the court ordered mother to serve that total 21 months of incarceration on the perjury charges consecutively to the sentence she already was serving on her criminal mistreatment conviction. The most recent information in the record indicates that mother was scheduled to be released from prison in October 2012, although her "maximum" date was in February 2013.

B. *DHS's involvement with mother and the children through early 2011*

DHS filed jurisdictional petitions for M and J in April 2010. In June 2010, mother admitted allegations that the children were dependent on a public agency's care and needed court services because mother "has been arrested for Criminal Mistreatment, is currently incarcerated, and unavailable to parent." The juvenile court took jurisdiction based on that admission, and the court and DHS encouraged mother to get related services. For example, DHS's August 2010 letter of expectation explained, among other things,

---

[2] Mother testified at the termination trial that she had not committed perjury, notwithstanding her decision to "take the plea."

that mother needed to "be able to recognize and respond appropriately to abuse of a child in the home," to "demonstrate she is able to understand the impact of sexual abuse in the family and how this affects the care and safety of the children in the home," and to "identify and consistently manage [her] own mental health issues in order to be available to meet the needs of the children." The letter outlined services that mother should obtain, including a psychological evaluation and any recommended treatment and family sex-abuse treatment.

DHS caseworkers repeatedly met with mother while she was incarcerated. Caseworker Stebbins had conversations with mother about what had happened and about mother's need to change so she could protect her children. Stebbins found those conversations difficult, as mother would start by "saying the things * * * that she thought [Stebbins] wanted to hear," but upon being questioned "would become flustered, or not have a congruent line of thoughts." Stebbins explained:

> "[T]here were two sides of the fence basically when we would have conversations. At times she would be saying that she did try to protect [B] and she would always try to protect [J] and [M].
>
> "And then at different times she would talk about how the issues that [father] had were [B's] fault, and she didn't see any reason to try to have to change in order to protect [J] and [M]."

Mother was able, cognitively, to understand the right thing to say, but Stebbins opined that her "true colors * * * would not be congruent with appropriate or adequate parenting according to agency standards."

Despite mother's equivocation about her own responsibility, DHS initially planned for the children to be reunited with mother after she was released from her 13-month sentence for criminal mistreatment. While mother was incarcerated on that sentence, Stebbins spoke with her "all the time about the timeline" and how mother would need to show, after she was released, "that she was making clear and consistent progress in order for [DHS] to continue

to look at a reunification." Stebbins told mother that DHS would want her to engage in mental-health counseling, medication-management services, and "some sort of parenting around [being] a non-offending parent as far as sex abuse is concerned." Stebbins also encouraged mother to address what she had been through in life "so that she could be a healthy parent" for M and J. They talked about how mother "would need to hit the ground running" once she was released and "be in services right away" because "she would basically have 60 days and then she would have to show the judge that * * * it was worth continuing the plan of return to parent * * *." Mother was not able to obtain the recommended services in prison, but DHS paid for her to undergo a psychological evaluation.

The juvenile court entered another jurisdictional judgment in February 2011, noting that the case plan remained "return to parent" with a permanency hearing to be held in April 2011. DHS sent mother another letter of expectation that month, largely reiterating the expectations described in its earlier letter, but also stating that she should complete a parenting class at Coffee Creek Correctional Facility, if one was available, and should complete a psychological evaluation that had been scheduled for later that month. In March 2011, mother admitted a jurisdictional allegation that she had "mental health difficulties that left untreated compromise her ability to parent."

The juvenile court entered permanency judgments for M and J in April 2011, changing the plan for the children to adoption. The court found that mother had not made sufficient progress toward reunification despite DHS's reasonable efforts, which included referring mother to a psychological evaluation and referring the children for counseling or treatment, and that the children could not safely be returned to her care because she remained incarcerated, as she had been "throughout the entire case." The court ordered that a termination petition be filed no later than May 2011, with the goal of placing the children for adoption by May 2012.

After the juvenile court changed the permanency plan to adoption, the family's case was transferred to DHS Caseworker Harvel. When Harvel first met with mother and asked why she was incarcerated, mother did not talk about father's abuse of B or of her own convictions for criminal mistreatment and failure to report abuse. Instead, mother talked about how B's involvement with a boy in Stayton had "gotten out of control," leading to the family's relocation to Salem.

By the time Harvel next met with mother, she had been convicted of perjury. Harvel encouraged mother to get counseling, and mother said she had somebody with whom she could talk every couple of weeks. Mother appeared to still be blaming B for having been sexually abused by father, and Harvel explained to mother that "she would have to do some work * * * about taking responsibility for the situation" if the children were to be safely returned to her care.

## C. *Mother's mental health*

Psychologist Jerome Gordon conducted an evaluation of mother in February 2011 that consisted of a clinical interview, the administration of several tests, and review of materials provided by DHS, including a police report. Mother tried to convince Gordon that "this was in part the fault of the child." At trial, Gordon did not recall mother having said anything during the evaluation about how she should have seen signs of the abuse or should have been aware of what was going on in her house. Mother did tell Gordon that she was, herself, a victim of childhood sexual abuse, as well as sexual abuse and "physical torture" inflicted by her first husband.

When Gordon asked mother about her involvement with DHS, mother responded "that it was because she could not pick up the children from school when she was talking to the police about her husband." She asserted that DHS would not tell her the nature of the concerns, but also said that "she would take her classes and everything that [was] required" and was eager to do so. With respect to her incarceration, mother told Gordon that "she took a plea without reading it and did not realize that the sentencing was up to the judge."

Gordon diagnosed mother, on Axis I, with post-traumatic stress disorder (PTSD) and a severe "adjustment disorder with anxiety and depressed mood"; he also reported that he "wanted to rule out other depressive disorders and other anxiety disorders and rule out alcohol abuse."[3] Mother's PTSD diagnosis relates to her report of being a sex-abuse victim. That diagnosis means that a person "is still affected by [a traumatic experience] in a variety of ways, including distress, sometimes flashbacks or nightmares. Very often it affects the way they relate to others. Self-esteem issues may be part of that as well." Mother seemed "psychologically over-whelmed" by her PTSD, depression, and anxiety while incar-cerated; Gordon did not believe that she had "the psycho-logical resources to deal with the stress in her life." The medications that mother takes are meant to address those Axis I conditions.[4]

Gordon also gave mother an Axis II diagnosis of "a personality disorder, not otherwise specified with dependent and anti social features." The dependent features "are related to her essential desire to maintain relationships that she perceives as being important to necessary to her," which she "may place * * * ahead of her own needs in order to maintain them." The antisocial aspect "means that she tends to act without much regard for social demands and expectations." That aspect of mother's personality disorder "was related to her not reporting the abuse when it occurred, and at least partially ignoring the precursors or signs," like grooming, that Gordon believed that mandatory reporters are trained to look for. He testified that the effect of those features on mother's functioning "is significant."

Gordon explained how his evaluation and diagnosis of mother led him to conclude that she is unlikely to protect her children from harm. He saw mother's failure to report father's abuse of B immediately, as she had been trained to do as a mandatory reporter, as "a major concern." In addition,

---

[3] Gordon testified that he was concerned about mother's substance use because of reports suggesting that mother drank more alcohol than she acknowledged to him.

[4] At the time of the termination trial, mother testified, she had stopped taking sleeping medications and was "just on a low dose anxiety medicine" and "a very low dose anti-depressant."

Gordon testified that mother's attempt to partly blame B for having been abused related to mother's PTSD and her personality disorder: "she seems to be someone who has not gone through adequate treatment to understand how the abuses affected her and her functioning." As a result, mother had "difficulty understanding the reason that she wants to be dependent upon someone else for direction and support" and had "placed that above other important concerns."

Gordon concluded that mother "is going to have difficulty adequately protecting her children" despite her intellectual ability to understand what is appropriate. He based that conclusion not only on mother's failure to protect B from abuse, but also on her belief—despite father having confessed that the abuse occurred—that she had taken adequate precautions to prevent that from happening. Mother may not want her children to be traumatized but Gordon was concerned that she perhaps "would not let herself be aware of abuse occurring again," just as happened with B.

Gordon testified that, to help herself, mother would need to engage in "a long term process that would include long term counseling involvement * * * related to her history of abuse * * *." Gordon testified that counseling on "dependent relationships and PTSD" could be helpful to mother while she was incarcerated. However, it would be important for mother to continue treatment after release from prison "because it's one thing to learn about [treatment processes] and deal with them in a structured setting * * *, but it's another thing to integrate them into your life on an ongoing basis with the other stress—life stresses that go on elsewhere." Gordon opined that it would "be important" for mother to continue that counseling for "at least several months" after she were released "and perhaps more, depending upon the stresses and the complexity of the situations in which she finds herself."

Notwithstanding his recommendation that mother engage in services, however, Gordon testified that he was "quite concerned" about mother's long-term prognosis, particularly after she completes post-prison supervision and

will no longer be subject to the same "levels of scrutiny."[5] The effect of mother's personality disorder on her functioning is "significant" and "she is unlikely to change in that regard." Gordon testified that personality disorders generally "do not respond to medication" and mother's, specifically, will not. A personality disorder, he explained, "is an unchanging pattern."

Consequently, Gordon concluded, mother "always" will seek to have her dependency needs met in some manner and "always" will put her own needs before the children's. Accordingly, even if mother divorced father and were released from prison, Gordon "still would have concerns" about the children's safety. Mother "would be attracted to someone who is controlling and perhaps manipulative," and would be susceptible to a manipulative partner. And Gordon would have concerns even if mother were "able to not have a man in her life" and met her dependent needs through other means, perhaps a church. As Gordon explained, predators are found "even in churches" and mother "would be vulnerable to manipulation * * * by people that she thought she could trust and would want to trust."

Gordon believed that mother would need to make "notable changes in herself" even to be able to interact with the children occasionally if they remained placed in another home: "Part of it would depend upon if she has been able to make some changes in her life, and what the type of relationship would be—you know, if there would be supervision or not, if she would be able to relate appropriately to her children."

---

[5] Gordon's remark about the scrutiny that mother will face while on post-prison supervision appears to relate to his view that her average-to-above-average intelligence allows her to modify her behavior when she understands, cognitively, that temporary modification may sometimes be necessary to meet another person's expectations. At the termination trial, Gordon characterized this statement by DHS's attorney as essentially accurate:

"[B]ased on [mother's] cognitive abilities, she's above average intelligence, that she could conform to standards as long as somebody was basically watching her, but once that—whether it was supervision or—you know, a friend, or somebody was not watching her, kind of turn their back, that things would likely revert back[.]"

## D. *The children's status at the time of trial*

Evidence about how M and J have fared since being removed from the parents' home came primarily through testimony of DHS caseworkers, the children's counselor, and their first foster father, who cared for them until sometime between the beginning of the termination trial, in September 2011, and its continuation in November 2011. The foster father testified that the children were healthy when they came into his care and, in September 2011, were healthy and well adjusted.

In mid-2011, the children started seeing counselor Amy Morris, who had seen them five times by the second day of trial in November 2011. At that point, the children had moved to a new foster home, with a family that lives next to the first foster family, and with whom the children already had spent a significant amount of time. The children were exhibiting some concerning behaviors in the new foster home. However, Morris testified, J was excited about that placement; he said that "he felt the most part of their family." M also had spoken about being close with that family, which Morris believed could meet the children's needs.

Morris testified that M has an adjustment disorder with anxiety, related to being removed from her home and put in a new placement. M had expressed that she misses mother; nonetheless, Morris did not think she should visit with mother until she had settled into her new placement.[6] Morris was "extremely concerned" about M's ability to attach to her new foster parents and settle in. She also testified that she was concerned about M's ability to feel secure in her foster placement if the plan were to wait for mother to be released from prison in a year, and then transition M back to her care over the course of the next year. That would be "difficult for her to do," and, if she were "changed yet again," Morris believed that M would be "disrupt[ed] even more," which "could result in further mental health issues beyond an adjustment disorder." M needed permanency "now"; until that happened, she would not "be able to work through some of the issues that have brought her into foster

[6] The children have not visited with either parent since they were placed in DHS custody.

care, and what it has meant for her and her family." Morris testified that J also has an adjustment disorder, "with a mixed disturbance of emotions and conduct." He also has some anxiety and other mood difficulties "as well as some behavioral challenges," although he is not as anxious as M. Morris testified that, like M, J could not wait a year for permanency with mother.

Caseworker Harvel testified in September 2011 that the children had "lots of opportunities" for an adoptive placement; she had no concerns about their adoptability. At that point, Harvel believed that the agency might be able to place the children with an adoptive resource by December 2011. The children had told Harvel repeatedly that they "just want[ ] to know where [they are] going to be"; that had been the theme since she started talking with them in April 2011. Both children had said that it was "okay" that they were not seeing their parents.

In November 2011, DHS caseworker Hunter, who had taken over the case from Harvel, testified that the children were "adjusting really well" to the second foster home, where they seemed comfortable and confident. Two weeks still remained in the period for recruiting an adoptive family; although the children's foster home might be the adoptive placement, that placement was not guaranteed.

Psychologist Gordon, too, testified generally that stability is important for children and that it could be confusing for children to be reunited with mother after being separated from her for over two years while she was incarcerated. In answering a question about whether waiting for a parent to be released from custody and make all necessary changes could be in any child's best interests, Gordon responded, "Oh, not for that length of time."

E. *Mother's testimony at the termination trial*

Mother's trial testimony painted a somewhat different picture of the events described above and, to the extent that it conflicts with other evidence we have credited, we find it not to be credible. For example, mother testified, in contradiction to Pierce, that she had not been "concerned with anything [father] was doing" before the April 2010

incident, but had been concerned only that B was spending too much time playing video games and had "some kind of school girl crush" on father that was not appropriate. She said that she never had suspected father of anything sexual because he had been approved to be a foster parent and was supposed to be "one of the good guys."

Mother's description of the April 2010 incident also differed from B's. Although mother acknowledged that she had seen B's pubic hair exposed because the child was sprawled out and her loose-fitting shorts "had fallen to the side," mother testified that father and B "weren't doing anything" and that B's shorts were directed at the television, not toward father. Mother did not see any physical contact between father and B and testified that "[t]hat wasn't the point. The point was she was supposed to be in bed at 10:00." Then, mother explained, "it crossed [her] mind that this [was] too much" and "there's got to be something going on" because "in our house you wear underwear * * * under clothes." That was the reason, according to mother, why she asked B if father had ever kissed her or put his hands on her.

Mother testified that she now knows that father abused B, although she initially had not "know[n] what was going on" or whether she "really was delusional." Mother testified that the week following the April 20 incident was "extremely fuzzy" to her because she had flushed all of her medications down the toilet after she talked to B on April 20 about whether father had abused her. Mother explained that she had not reported the abuse because B "was denying it" and saying that if mother kept "making these accusations," she would kill herself. Mother testified that she had been giving B time "to come to terms with it." She also disclaimed some (unidentified) aspects of the statements she made to Sergeant Bennett when he interviewed her in late April 2010, saying that some of the things she had referred to in the interview actually described a dream she had had, not reality. Mother explained that the Trazodone she had taken "was bringing on very, very realistic dreams," that part of what she said in the interview was based on those dreams, and that she "was just spewing out everything [she] could

to back up [B], because maybe it did happen[]. Maybe this happened." Mother also denied that she had blamed B for the abuse; she said that she had only been explaining why she had not suspected father, who "never gave [her] any outward signs."

In addition, mother testified about the services that she has received in prison, such as counseling and mental health classes, including one class on PTSD that she found very helpful. Although she had not yet participated in therapy about sexual abuse within the family, she would be very willing to do so. Mother also described her plans for life after prison, including her intent to divorce father, move in with her own father, get a job, get counseling, be involved in church, and have a mentor. She thought that, if everything went well, M and J should be able to move back in with her within two or three months after her release from prison. She believed, though, that her parental rights would be terminated because of the length of her incarceration. If that happened, she hoped for an open placement, so she could take "more of like an aunt's role than the mom's role."

## II. ANALYSIS

The juvenile court terminated mother's parental rights for unfitness under ORS 419B.504. Accordingly, we review the record *de novo* to determine whether the state proved, by clear and convincing evidence, "that mother is unfit because she engaged in conduct or is characterized by a condition that is seriously detrimental to the child and it is improbable that the child can be integrated into mother's home within a reasonable time because the conduct or condition is unlikely to change." *Dept. of Human Services v. C. M. M.*, 250 Or App 67, 75, 279 P3d 306, *rev den*, 353 Or 341 (2012). Mother's fitness "is measured at the time of the termination trial, and the focus of the test is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Id.* (citations and internal quotation marks omitted). Even when a parent is unfit by reason of conduct or conditions unlikely to change within a reasonable time, we will affirm termination of that parent's rights only when termination serves the child's best

interests. *State ex rel Dept. of Human Services v. J. S.*, 225 Or App 115, 129, 200 P3d 567, *rev den*, 346 Or 157 (2009). We address mother's unfitness, the unlikelihood that the children could be returned to her care within a reasonable time, and the children's best interests, in that order.

A.  *Mother's unfitness*

In the judgments terminating mother's parental rights, the juvenile court found that mother was unfit and that integration into her home was improbable within a reasonable time due to conduct or conditions not likely to change, including her incarceration, her failure to present a viable plan for the children's return to her care and custody, her "[m]ental, emotional, or psychological abuse of [the children's] sibling," her own mental or emotional illness, her failure to protect B from father's abuse, and her lack of effort to adjust her circumstances to make the children's return possible.

On appeal, mother argues that the record does not support the trial court's findings that she had been aware "for months" that father and B were in an inappropriate relationship and that she had failed to protect B from father's abuse. Instead, mother suggests, until the April 2010 incident, she had thought only that B had a "school girl crush" on father. And once she did realize that father had abused B, mother contends, she took appropriate steps including "kick[ing] him out of the house" and taking B to a counselor.

We reject those assertions, and we conclude that mother is unfit by reason of conduct and conditions that include her failure to protect B from father's abuse. Mother consciously suspected by late 2009 that father and B were in a sexual relationship. Mother admitted to Bennett that she had walked in on father and B in an "awkward situation" late that year. Pierce, too, testified that mother had told her about seeing B and father in compromising circumstances before the April 2010 incident—circumstances that prompted B and father to "den[y] it" to mother, who told Pierce that she had gotten drunk because she did not want to acknowledge what she had seen (B "shot up" from a position sitting on the

floor next to father, who was sitting in a chair and wearing a bathrobe with nothing underneath). B testified that she heard mother saying to father "that she thought she saw something happening between [father and B], and he would say that [mother was] just crazy." B reported that father's tone of voice "could vary" when he said those kinds of things to mother, and we infer from B's testimony that such confrontations occurred on more than one occasion. Tellingly, mother told Pierce after the April 2010 incident "that everything she suspected was true."

Not only did mother allow father's abuse of B to continue for months after she first suspected it, but even after B told her in April 2010 what had been happening, mother did not take appropriate steps. Although mother did kick father out of the house in one sense, as she argues on appeal, that only involved him going to a nearby trailer, and she brought him back into the home the next day to engage in sexual activity. And, although mother took B to a physician, she lied to the doctor about why B needed a gynecological examination and antidepressants, preventing B—who had threatened to kill herself—from immediately getting the mental health services she needed. Mother's limited disclosure of the April 2010 incident also reflected her prioritization of her own needs and father's: she told Bennett that she had not fulfilled her mandatory reporter duties because she did not want to lose her children and did not want father to get in trouble; she also begged Pierce not to tell anybody what had happened because she did not want to have her children taken away from her. In short, mother failed for months to protect B from sexual abuse that she either suspected or knew was happening and also failed to take steps aimed at helping B deal with the long-term effects of that abuse.

Nonetheless, mother argues that, even assuming that she failed to adequately protect B, evidence at trial demonstrated that "she was unlikely to ignore the early signs of abuse in the future." But mother does not identify that purported evidence, and we find no credible evidence in the record that supports her claim. Instead, the record includes compelling evidence that contradicts mother's assessment of her current ability and willingness to recognize danger

and protect her children from it. First, psychologist Gordon testified that mother's personality disorder is so significant that she will "always" put her own dependency needs above the needs of her children, that she will be attracted to controlling and manipulative people, that she is unlikely to recognize when other people present a danger to her children, and that her personality disorder is not amenable to treatment. Gordon and DHS caseworkers testified that, although mother is able to understand *cognitively* what she should say about needing to protect her children, her actual behavior is not likely to be consistent with that intellectual understanding.

Second, Gordon's evaluation is confirmed by mother's behavior since April 2010, which demonstrates that she still places her needs (perhaps including her need to please father) above her children's. Six months after being imprisoned for criminal mistreatment, mother perjured herself at a hearing in father's criminal case, denying that she had consented to the recording of a pretext call and denying what B had told her about being abused. Although the record is not completely clear, it suggests that mother was attempting to lessen the chances of father being convicted, her current contrary protestations notwithstanding. One result of that perjury was that mother was sentenced to 21 additional months in prison, significantly interfering with any opportunity she might otherwise have had to re-establish a relationship with her children.

In addition, mother consistently blamed B, at least in part, for the abuse, starting with her April 2010 interview with Bennett, continuing in her evaluation with Gordon in February 2011, and persisting in her later discussions with DHS caseworkers. Relatedly, mother suggested to a DHS caseworker that she did not see any need to change her own behavior in order to protect her other children: "she would talk about how the issues that [father] had were [B's] fault, and she didn't see any reason to try to have to change in order to protect [J] and [M]."

Moreover, several aspects of mother's own testimony at the termination trial confirmed Gordon's conclusion that

she remained unable to protect her children, over 18 months after they had been removed from her care. Mother attempted to minimize what she knew about the abuse, testifying that, before April 2010, she had not been concerned about anything that father had been doing, and never had suspected father of any sexual wrongdoing. She also tried to minimize what she had observed during the April incident, testifying that father and B had not been "doing anything" when she walked in, and that she had noticed only that B was not wearing underwear beneath her shorts. In our view, that testimony reflects mother's continuing need to falsely portray herself as an innocent bystander who never saw any signs of sexual abuse and who bears no responsibility for what happened.

Perhaps even more significantly, mother's persistent inability or unwillingness to accept any responsibility for having failed to protect B confirms Gordon's conclusion that she is unlikely to be able to protect J and M in the future, as she had not confronted—much less overcome—those aspects of her own personality that resulted in her failure to intervene when she suspected the abuse. Nor had mother gained any insight, by the time of trial, into the significance of her own history as a victim of sexual abuse. When asked whether she had spoken to Gordon about that history, mother responded, "That would be when I was married the first time, but what does that have to do with this." Mother also had not gained insight into the significance of having blamed B for the abuse that she suffered. To the contrary, she insisted at trial that she never had placed blame on B. We find that testimony troubling, given other witnesses' consistent reports that—even several months after she had been incarcerated for criminal mistreatment—mother still faulted B, in part, for being abused by father. Until mother is able to acknowledge who bears responsibility for the sexual relationship between father and B, she will remain unable to safely parent her other children.

In sum, we find mother unfit based on the following conduct and conditions: her failure to protect B from father's abuse, and her mental or emotional illness that renders her

incapable of properly caring for the children, *i.e.*, keeping them safe.[7] We also conclude that mother's conduct and conditions are seriously detrimental to M and J. The children simply cannot be safe with mother, who ignored her husband's sexual abuse of her 13-year-old child for several months, who still only diffidently acknowledges that the abuse occurred, and who lacks any insight into how her own psychological makeup and behavior might have contributed to that abuse repeatedly occurring just outside her own bedroom door.

Our conclusion might be different if the record included any credible evidence that mother had come to grips with her own conduct and the aspects of her personality that led her to place her own dependent needs above the safety of her children. But we find no such evidence in the record. Rather, the historical and psychological evidence demonstrates clearly and convincingly that mother does not recognize risks that other people pose to her children. Her resulting inability to protect her children is, itself, seriously detrimental to J and M, even though those children have not themselves been abused. *See C. M. M.*, 250 Or App 68 (discussing the mother's inability to protect her child from the father); *State ex rel Dept. of Human Services v. J. S.*, 219 Or App 231, 261, 182 P3d 278 (2008) ("A condition or conduct can be deemed 'detrimental' based on potential harm even before that harm comes to pass.").

---

[7] Because we find mother unfit for those reasons, we do not address the other grounds on which the trial court based its unfitness determination, including the length of mother's incarceration and resulting separation from her children. Accordingly, we need not discuss, in detail, mother's argument that the trial court erred in finding her unfit based on her incarceration. Rather, in that regard, we note only that we reject mother's argument that this case "is on all fours" with our decision in *Dept. of Human Services v. C. M. P.*, 244 Or App 221, 260 P3d 654, *rev den*, 351 Or 254 (2011), a case in which we reversed a judgment terminating the parental rights of a mother who had been incarcerated after she, at the age of 19, killed her children's father during a domestic dispute. We disagree with mother's assessment of *C. M. P.*'s significance to this case, for two reasons. First, we do not rely in this case on mother's incarceration as a basis for determining that she is unfit to parent M and J. Second, in *C. M. P.*, there was "little to no evidence, let alone clear and convincing evidence," that the mother's past problems with domestic violence and substance abuse during her teenage years persisted at the time of the termination trial. *Id.* at 235. Here, mother's problems not only persist, they are intractable.

B. *The unlikelihood that the children could be returned to mother's care within a reasonable time*

We also conclude that the conduct and conditions that make mother an unfit parent are unlikely to change in a way that would allow M and J to return to mother's home within a reasonable time, meaning "a period of time that is reasonable given [the children's] emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). Both children have been diagnosed with adjustment disorders, which are related to their placement in foster care. Such diagnoses are not unusual in children who have been removed from their parents' home and, under certain circumstances, evidence that a child suffers from an attachment disorder may not demonstrate that a parent's conduct or conditions have been seriously detrimental to the child, or that it is unreasonable to require the child to wait while his or her parent engages in services that may lead to safe reunification of the family. *See Dept. of Human Services v. C. M. P.*, 244 Or App 221, 236, 260 P3d 654, *rev den*, 351 Or 254 (2011) ("[D]ifficulty adjusting to a placement move is not extraordinary in the juvenile system[.]").

This case is different, however, for two reasons. First, the concerns that the children's counselor had about their well-being went beyond a bare diagnosis of adjustment disorders. The counselor was "extremely concerned" about M's ability to attach to her second foster family, particularly if she had to wait for permanency, anticipating the possibility that she would transition back to mother's care after mother's release from prison—an event not scheduled to occur until nearly a year after the termination trial. Indeed, if M were moved again, she was at risk of developing "further mental health issues." Moreover, until M achieved permanency—from her perspective, until she knew "where [she was] going to be"—she was not going to be able to process the issues that brought her into foster care. For all of those reasons, the counselor testified, M needed permanency "now." And J did not have a simple adjustment disorder, but also exhibited "a mixed disturbance of emotions and conduct," meaning that the stressors in his life had resulted in "mood difficulties"

and "behavioral challenges." Again, the counselor was "very concerned" about what would happen if J were made to wait over a year to be reunified with mother, as he was excited about his foster placement and needed to know where he was going to live in the long term. In short, the counselor testified, both children needed permanency "as soon as possible given the difficulty that they are having processing what has happened to their family."

Second, this is not a case in which there is a realistic possibility that mother will be able to safely parent her children any time in the foreseeable future. Even if mother follows through on her stated intentions to divorce father and to obtain additional counseling upon being released from prison, both Gordon's evaluation and mother's past choice of abusive romantic partners indicate that she will again gravitate toward controlling and manipulative people in order to meet her own dependency needs, and that she is unlikely ever to be able to prioritize her children's needs above her own. Thus, even if mother does engage in the post-release "long term process," including "long term counseling involvement *** related to her history of abuse" that Gordon recommended, it is highly unlikely that she will make meaningful progress in that regard. To the contrary, mother's psychological barriers to becoming a safe parent may well increase when she is released from prison, when her PTSD, depression, and anxiety—which leave mother "psychologically overwhelmed"—likely will exacerbate the difficulties that she already faces. In short—based both on the children's individual needs and on the intractability of the barriers to mother becoming a safe parent—we conclude that integration of the children into mother's home is improbable within a reasonable time because of conduct and conditions unlikely to change.

C. *The best interests of the children*

We readily conclude that termination of mother's parental rights is in the best interests of M and J, who have been in foster care since April 2010. Mother is presently unable to provide a safe home for the children and we discern little likelihood that she would be able to do so any time in the foreseeable future. "As we have recognized time and time

again, 'at some point, the child's needs for permanency and stability in life must prevail.'" *C. M. M.*, 250 Or App at 79 (some internal quotation marks and brackets omitted). The children have said that it is "okay" that they are not seeing mother, they have a stable, loving home with the current foster family, and they will easily be adopted, perhaps into that family. Accordingly, termination of mother's parental rights, as well as father's, is in the children's best interests.

Affirmed.